Appeal No. 13-2881
(Consolidated With Case Nos. 13-3353 and 13-3495)

---

## UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

---

| | |
|---|---|
| IN RE: | Appeal from the United States District Court for the Eastern District of Wisconsin |
| ARCHDIOCESE OF MILWAUKEE, Debtor. | |
| | No. 2:13-cv-0179-RTR |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS, Appellant, | Rudolph T. Randa, Judge |
| Nos. 13-2881 and 13-3495 | |
| JEROME E. LISTECKI, Archbishop, Trustee of the Archdiocese of Milwaukee Catholic Cemetery Perpetual Care Trust, Appellee. (Caption continued on next page) | |

---

Appeal from and Petition for a Writ of Mandamus to the
United States District Court for the Eastern District of Wisconsin
Case No. 13-CV-179
Hon. Rudolph T. Randa

---

### CORRECTED RESPONSE BRIEF OF APPELLEE

---

GODFREY & KAHN, S.C.

Brady C. Williamson, SBN 1013896
Jennifer L. Vandermeuse, SBN 1070979
780 North Water Street
Milwaukee, WI 53202-3590
Phone: 414-273-3500
Fax: 414-273-5198
Email: jvandermeuse@gklaw.com

*Attorneys for Appellee Archbishop
Jerome E. Listecki*

IN RE:

ARCHBISHOP OF MILWAUKEE,
        Debtor.

OFFICIAL COMMITTEE OF UNSECURED
CREDITORS,
        Petitioner,

RUDOLPH T. RANDA,
        Respondent,

No. 13-3353

      v.

JEROME E. LISTECKI, Archbishop,
Trustee of the Archdiocese of Milwaukee
Catholic Cemetery Perpetual Care Trust,
        Party-In-Interest,

     and

ARCHDIOCESE OF MILWAUKEE,
        Party-In-Interest.

Appeal from the United States
District Court for the Eastern
District of Wisconsin

No. 2:13-cv-00179-RTR

Rudolph T. Randa, Judge

DISCLOSURE STATEMENT

**CIRCUIT RULE 26.1    DISCLOSURE STATEMENT**

Appellate Court No: 13-2881

Short Caption: Official Committee of Unsecured Creditors v. Archbishop Jerome E. Listecki, Trustee

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**[  ]    PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

    Archbishop Jerome E. Listecki, as Trustee of the Archdiocese of Milwaukee Catholic Cemetery

    Perpetual Care Trust

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Godfrey & Kahn, S.C.

(3)  If the party or amicus is a corporation:

    i)  Identify all its parent corporations, if any; and

      N/A

    ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

      N/A

Attorney's Signature: s/  Brady C. Williamson    Date: September 13, 2013

Attorney's Printed Name: Brady C. Williamson

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes  ☒    No _____

Address: 780 North Water Street

    Milwaukee, WI 53202-3590

Phone Number: 414-273-3500    Fax Number: 414-273-5198

E-Mail Address: bwilliam@gklaw.com

rev. 01/08 AK

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT ........................................................ 3

TABLE OF AUTHORITIES .......................................................iii

JURISDICTIONAL STATEMENT ................................................ 1

STATEMENT OF ISSUES......................................................... 2

STATEMENT OF THE CASE..................................................... 3

    A.    Catholic Belief, Catholic Cemeteries And The Perpetual Care Trust. ..................................................................... 6

    B.    Procedural History. .......................................... 10

SUMMARY OF ARGUMENT .................................................. 14

ARGUMENT ..................................................................... 16

I.    RFRA APPLIES TO THE FEDERAL TURNOVER AND AVOIDANCE CLAIMS BROUGHT BY THE COMMITTEE. ................................. 16

    A.    The Committee Is Subject To RFRA Because, At A Minimum, It Acts Under Color Of Law. ....................................... 17

    B.    Applying RFRA To The Committee's Claims Is An Appropriate Exercise Of Federal Law. ....................................... 24

II.    RFRA PRECLUDES THE COMMITTEE FROM REACHING THE TRUST. ......................................................................... 27

    A.    The "Substantial Burden" Question Posed By An Avoidance And Turnover Claim Can And Should Be Decided Now. ............................. 27

    B.    The Trustee Has Demonstrated A Substantial Burden On The Free Exercise Of Religion........................................ 30

    C.    The Bankruptcy Code's Avoidance And Turnover Provisions Do Not Serve A Compelling Government Interest, Much Less An Interest Advanced By Least Restrictive Means................................ 35

III.    THE FREE EXERCISE CLAUSE ALSO BARS THE COMMITTEE'S TURNOVER AND AVOIDANCE CLAIMS. ................................. 39

A.    The Free Exercise Analysis Requires Examination Of The Burden. ........................................................................ 40

B.    Applied Here, The Bankruptcy Code Would Impose A Substantial Burden On The Trustee. ................................... 42

IV.    THE DISTRICT COURT APPROPRIATELY DENIED THE COMMITTEE'S MOTIONS TO VACATE THE JUDGMENT AND TO RECUSE JUDGE RANDA. ............................................ 43

A.    Assuming Its Merits Are Reached, The Recusal Motion Is Baseless. ................................................................... 45

B.    There Is No Basis To Vacate The Decision. ......................................... 50

CONCLUSION .......................................................................... 53

CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7) ..................................... 55

CERTIFICATE OF SERVICE AND FILING .............................................. 56

CODE OF CANON LAW (EXCERPTS) ....................................................... Addendum

# TABLE OF AUTHORITIES

<u>Page</u>

## CASES

*Blixseth v. Brown*, 470 B.R. 562 (D. Mont. 2012) ...................................................... 19

*Brownson v. Bogenschultz*, 966 F. Supp. 795 (E.D. Wis. 1997) ................................ 17

*Callahan v. Woods*, 736 F.2d 1269 (9th Cir. 1984) .................................................... 37

*Cash v. Illinois Div. of Mental Health*, 209 F.3d 695 (7th Cir. 2000) ....................... 50

*Catlin v. United States*, 324 U.S. 229 (1945) ............................................................... 1

*Christians v. Crystal Evangelical Free Church (In re Young)*, 141 F.3d
854 (8th Cir. 1998) ..................................................................................... 25, 26

*Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520
(1993) ............................................................................................ 36, 40, 41, 42

*City of Boerne v. Flores*, 521 U.S. 507 (1997) .......................................... 14, 24, 25, 26

*Civil Liberties for Urban Believers v. City of Chi.*, 342 F.3d 752 (7th
Cir. 2003) .................................................................................................. 12, 32, 40

*Eberts v. Goderstad*, 569 F.3d 757 (7th Cir. 2009) .................................................... 28

*Employment Division v. Smith*, 494 U.S. 872 (1990) ................................................. 40

*Family Life Church v. City of Elgin*, 561 F. Supp. 2d 978 (N.D. Ill.
2008) .......................................................................................................... 41, 42

*Gillette v. United States*, 401 U.S. 437 (1971) ........................................................... 36

*Ginn v. Mathews*, 533 F.2d 477 (9th Cir. 1976) ........................................................ 18

*Guardian Pipeline, L.L.C. v. 950.80 Acres of Land*, 525 F.3d 554 (7th
Cir. 2008) .................................................................................................... 45

*Hanover Nat'l Bank v. Moyses*, 186 U.S. 181 (1902) ................................................. 25

*Harvey v. Harvey*, 949 F.2d 1127 (11th Cir. 1992) ................................................... 39

*Hernandez v. Commissioner*, 490 U.S. 680 (1989) ......................................... 5, 34, 36

*Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114 (10th Cir.), *cert. granted*, 134 S. Ct. 678 (U.S. 2013) (No. 13-354) ......................................... 4

*Hook v. McDade*, 89 F.3d 350 (7th Cir. 1996) ............................................. 45

*In re Mason*, 916 F.2d 384 (7th Cir. 1990) ........................................... 48, 49

*In re Meyer*, 467 B.R. 451 (Bankr. E.D. Wis. 2012) .................................... 37

*In re Nat'l Union Fire Ins. Co.*, 839 F.2d 1226 (7th Cir. 1988) ................................ 49

*In re Navarro*, 83 B.R. 348 (Bankr. E.D. Pa. 1988) .................................... 37

*In re New Mexico Natural Gas Antitrust Litig.*, 620 F.2d 794 (10th Cir. 1980) ................................................................................. 45, 47

*In re Sherwin-Williams Co.*, 607 F.3d 474 (7th Cir. 2010) ......................... 48

*In re SPM Mfg. Corp.*, 984 F.2d 1305 (1st Cir. 1993) ................................. 20

*In re V. Savino Oil & Heating Co.*, 99 B.R. 518 (Bankr. E.D.N.Y. 1989) ................. 23

*In re Walnut Equipment Leasing Co.*, No. 97-19699DWS, 2000 WL 1456951 (Bankr. E.D. Pa. Sept. 22, 2000) ............................................... 21

*In re Young*, 152 B.R. 939 (D. Minn. 1993) ............................................... 37

*Jackson v. Metro. Edison Co.*, 419 U.S. 345 (1974) .................................... 23

*Jimmy Swaggart Ministries v. Board of Equalization*, 493 U.S. 378 (1990) ....................................................................................... 40

*Koger v. Bryan*, 523 F.3d 789 (7th Cir. 2008) ...................................... 31, 32

*Korte v. Sebelius*, 735 F.3d 654 (7th Cir. 2013), *petition for cert. filed*, 82 U.S.L.W. ___ (U.S. Feb. 6, 2014) (No. 13-937) ......................... 4, passim

*Lawrence v. Goldberg*, 573 F.3d 1265 (11th Cir. 2009) .............................. 20

*Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847 (1988) .......... 43, passim

*Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982) .................................... 18

*Mack v. O'Leary*, 80 F.3d 1175 (7th Cir. 1996), *vacated on other grounds*, 522 U.S. 801 (1997) ........................................................ 30, 31, 32

*McCarthy v. Fuller*, 714 F.3d 971 (7th Cir. 2013) ......................... 31, 33, 34

*McDaniel v. Paty*, 435 U.S. 618 (1978) .................................................. 39

*McKnight v. United States Steel Corp.*, 726 F.2d 333 (7th Cir. 1984) ..................... 50

*Morris v. Midway Southern Baptist Church (In re Newman)*, 183 B.R. 239 (Bankr. D. Kan. 1995), *aff'd*, 203 B.R. 468 (D. Kan. 1996) ........................ 22, 37

*New York City Housing Dev. Corp. v. Hart*, 796 F.2d 976 (7th Cir. 1986) ....................................................................................... 49

*O'Bryan v. Bureau of Prisons*, 349 F.3d 399 (7th Cir. 2003) ............................... 24, 25

*Official Comm. of Equity Sec. Holders v. Official Comm. of Unsecured Creditors (In re Adelphia Commc'ns Corp.)*, 544 F.3d 420 (2d Cir. 2008) ....................................................................................... 20

*Pan Am Corp. v. Delta Air Lines, Inc.*, 175 B.R. 438 (S.D.N.Y. 1994) ...................... 21

*Philip v. L.F. Rothschild Holdings (In re L.F. Rothschild Holdings)*, 163 B.R. 45 (S.D.N.Y. 1994) .................................................................... 21

*Philos Techs. v. Philos & D, Inc.*, 645 F.3d 851 (7th Cir. 2011) ......................... 50

*Reuber v. United States*, 750 F.2d 1039 (D.C. Cir. 1984) ................................. 18

*Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816 (7th Cir. 2009) .................... 19

*Schurz Commc'ns, Inc. v. FCC*, 982 F.2d 1057 (7th Cir. 1992) ............................ 44

*Stern v. Marshall*, ___ U.S. ___, 131 S. Ct. 2594 (2011) ................................. 2

*Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731 (7th Cir. 2006) ........................ 29

*Summers v. Singletary*, 119 F.3d 917 (11th Cir. 1997) .................................... 43

*Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826 (9th Cir. 1999) ................. 17

*Taunt v. Barman (In re Barman)*, 252 B.R. 403 (Bankr. E.D. Mich. 2000) ....................................................................... 18, 19, 20, 21

*Thomas v. Review Bd. Of Ind. Emp't Sec. Div.*, 450 U.S. 707 (1981) ................. 30, 32

*Tomic v. Catholic Diocese of Peoria*, 442 F.3d 1036 (7th Cir. 2006) ...................... 39

*Tort Claimants Comm. v. Roman Catholic Archbishop (In re Roman Catholic Archbishop)*, 335 B.R. 842 (Bankr. D. Or. 2005) .................... 22, 35, 36

*Tramonte v. Chrysler Corp.*, 136 F.3d 1025 (5th Cir. 1998) ............................... 46, 47

*Travelers Ins. Co. v. Liljeberg Enters., Inc.*, 38 F.3d 1404 (5th Cir. 1994) .......................................................................................... 43, 50

*Union Carbide Corp. v. U.S. Cutting Serv., Inc.*, 782 F.2d 710 (7th Cir. 1986) ................................................................................ 44, 47, 49

*United States v. Ali*, 682 F.3d 705 (8th Cir. 2012) ...................... 33

*United States v. Chrystal Evangelical Free Church* (*In re Young*), 82 F.3d 1407 (8th Cir. 1996), *vacated sub nom. Christians v. Crystal Evangelical Free Church*, 521 U.S. 1114 (1997) ...................... 18, passim

*United States v. Lee*, 455 U.S. 252 (1982) ................................. 36

*United States v. Murphy*, 768 F.2d 1518 (7th Cir. 1985)............. 53

*United States v. Patrick*, 542 F.2d 381 (7th Cir. 1976)............... 43

*United States v. Ruzzano*, 247 F.3d 688 (7th Cir. 2001)............. 44

*University of Notre Dame v. Sebelius*, No. 13-03853 (7th Cir. filed Dec. 23, 2013) (argued Feb. 12, 2014) ................................................ 4

*Vision Church v. Vill. of Long Grove*, 468 F.3d 975 (7th Cir. 2006)............. 40, 41, 42

*Wellness Int'l Network, Ltd. v. Sharif*, 727 F.3d 751 (7th Cir. 2013), *petition for cert. filed*, 82 U.S.L.W. ___ (U.S. Feb. 5, 2014) (No. 13-935) ........................................................................................ 2

*Williamson v. Indiana Univ.*, 345 F.3d 459 (7th Cir. 2003)................................. 51, 52

*Wyatt v. Cole*, 504 U.S. 158 (1992) ......................................... 21

*Yaodi Hu v. Am. Bar Ass'n*, 334 F. App'x 17, 19 (7th Cir. 2009) (unpublished).............................................................................. 45

*Youngman v. Bursztyn* (*In re Bursztyn*), 366 B.R. 353 (Bankr. D.N.J. 2007) ................................................................................... 21

## STATUTES

11 U.S.C. § 503(b)(2) ............................................................... 20

11 U.S.C. § 503(b)(3)(F) ........................................................... 20

11 U.S.C. § 542.......................................................................... 10

11 U.S.C. § 544 .................................................................................. 10

11 U.S.C. § 544(b)(1) ................................................................... 25, 26

11 U.S.C. § 544(b)(2) ................................................................... 39, 41

11 U.S.C. § 547 .................................................................................. 10

11 U.S.C. § 548(a) ............................................................................. 22

11 U.S.C. § 548(a)(2) ................................................................... 39, 41

11 U.S.C. § 548(a)(2)(A) ................................................................... 22

11 U.S.C. § 548(d)(3) ........................................................................ 39

11 U.S.C. § 548(d)(4) ........................................................................ 41

11 U.S.C. § 550 .................................................................................. 10

11 U.S.C. § 1102 ................................................................................ 17

11 U.S.C. § 1102(a)(1) ...................................................................... 19

11 U.S.C. § 1102(a)(4) ................................................................. 19, 20

11 U.S.C. § 1103(a) ........................................................................... 20

28 U.S.C. § 157(c)(2) .......................................................................... 2

28 U.S.C. § 157(d) ............................................................................... 1

28 U.S.C. § 455 ................................................................ 2, 43, 50, 51

28 U.S.C. § 455(a) ....................................................................... 48, 50

28 U.S.C. § 455(b)(4) ............................................................ 45, 47, 48

28 U.S.C. § 455(d)(4) ........................................................................ 45

28 U.S.C. § 586(a)(3)(E) ................................................................... 20

28 U.S.C. § 1291 ............................................................................. 1, 2

28 U.S.C. § 1334 ................................................................................. 1

28 U.S.C. § 1334(e) ........................................................................... 18

28 U.S.C. § 1651 ................................................................................................ 2

42 U.S.C. § 1983 .............................................................................................. 17

42 U.S.C. § 2000bb-1(a) (2012) ..................................................................... 16

42 U.S.C. § 2000bb-1(b) (2012) ................................................... 16, 35, 37

42 U.S.C. § 2000bb-2(1) ................................................................................ 17

42 U.S.C. § 2000bb-2(4) ................................................................................ 31

42 U.S.C. § 2000cc-5(7)(A) ........................................................................... 31

Wis. Stat. § 157.115(b)1.-2. (2011-12) ...................................................... 50

## OTHER AUTHORITIES

Fed. R. App. P. 4(a)(4)(A) ................................................................................ 1

Fed. R. App. P. 6(a) .......................................................................................... 1

Fed. R. Bankr. P. 7056 .................................................................................. 11

Fed. R. Civ. P. 56(f)(1) ........................................................................... 11, 13

Fed. R. Civ. P. 60(b)(6) ............................................................................ 43, 50

H.R. Rep. No. 103-88 (1993) ........................................................................ 25

Religious Liberty and Charitable Donation Protection Act of 1998 .......................... 39

Richard E. Flamm, *Judicial Disqualification* § 24.4 (2d ed. 2007 &
    Supp. 2012) .................................................................................................. 48

Shruti Chaganti, *Why the Religious Freedom Restoration Act Provides
    a Defense in Suits by Private Plaintiffs*, 99 Va. L. Rev. 343 (2013) ...................... 24

## JURISDICTIONAL STATEMENT

The Committee's jurisdictional summary is neither complete nor correct. On August 1, 2013, the District Court granted the Trustee summary judgment and dismissed the underlying adversary proceeding pursuant to its July 29, 2013 Decision and Order. *See* App 031-32[1] (the "Judgment"); *see also Catlin v. United States*, 324 U.S. 229, 233 (1945) (defining finality). The Judgment is final and appealable.

The Committee timely filed its Notice of Appeal on August 26, 2013 (the "Appeal"). This Court has jurisdiction over the Appeal pursuant to 28 U.S.C. § 1291 because the District Court withdrew the reference to the Bankruptcy Court under 28 U.S.C. § 157(d) and, accordingly, entered the Decision and Order and Judgment pursuant to its original jurisdiction under 28 U.S.C. § 1334. *See* App 009-10 ("Decision").

Because the District Court entered judgment pursuant to its original jurisdiction, the Committee's Motion to Vacate the Judgment and Decision and Order (the "Motion to Vacate"), filed on August 12, 2013, tolled the deadline for appeal. *See* Fed. R. App. P. 6(a), 4(a)(4)(A). However, given the perceived uncertainty about whether the District Court was also exercising concurrent

---

[1] The record citations, when possible, are to the appellant's appendix ("App") and appellant's supplemental appendix ("Sapp").

appellate jurisdiction,[2] the Committee filed the appeal on August 26, 2013. On October 1, 2013, the District Court denied the Motion to Vacate. The Committee timely amended its notice of appeal to include that denial. R.48. The Trustee agrees that the Court has jurisdiction over the Amended Appeal pursuant to 28 U.S.C. § 1291.

The Committee also filed a Motion to Recuse the Honorable Rudolph T. Randa on August 12, 2013, which the District Court denied on October 1, 2013. On October 22, 2013, the Committee filed its Petition for a Writ of Mandamus Directing the Honorable Rudolph T. Randa to Recuse Himself Pursuant to 28 U.S.C. § 455 (the "Petition"). This Court has jurisdiction over the Petition pursuant to 28 U.S.C. § 1651.

## STATEMENT OF ISSUES

1.  Does the Religious Freedom Restoration Act ("RFRA") apply to the Creditors' Committee and its claims because it acts under color of law and its claims rise or fall under federal law?

---

[2] The District Court initially agreed to review the Bankruptcy Court's January 17, 2013 Decision and Order pursuant to its bankruptcy appellate jurisdiction, but it ultimately withdrew the reference as well to avoid any uncertainty as to jurisdiction. *See* R.2 (citations to the U.S. Eastern District of Wisconsin court docket, Case No. 13-CV-179, are identified as "R.___."). App 009-10, Decision. In any event, the issues involved are all non-core, and the parties expressly declined to consent to a final determination by the Bankruptcy Court. Accordingly, the Committee's summary judgment motion fell under the direct authority of the District Court. *See* 28 U.S.C. § 157(c)(2). This case presents no jurisdictional issues under either *Stern v. Marshall*, ___ U.S. ___, 131 S. Ct. 2594, 2609 (2011), or *Wellness Int'l Network, Ltd. v. Sharif*, 727 F.3d 751 (7th Cir. 2013), *petition for cert. filed*, 82 U.S.L.W. ___ (U.S. Feb. 5, 2014) (No. 13-935).

2.  Subject to RFRA, does the Committee's attempt to invade the Trust impose a substantial burden on religious exercise, a burden neither justified by a compelling government interest nor achieved by the least restrictive means?

3.  RFRA aside, does the First Amendment's free exercise clause bar the Committee's claims because of the substantial burden they impose?

4.  Did the District Court abuse its discretion when it denied the Committee's untimely Motion to Vacate, based on the assertion that Judge Randa should have recused himself?

## STATEMENT OF THE CASE

This case presents a single question of federal statutory and constitutional law with significance beyond its undisputed facts. Does the Religious Freedom Restoration Act of 1993 or the First Amendment's free exercise clause prevent the Official Committee of Unsecured Creditors (the "Committee") in this diocesan Chapter 11 case from trying to reach more than $55 million in long segregated trust assets? Those assets are held by the Archdiocese of Milwaukee Catholic Cemetery Perpetual Care Trust (the "Trust"), which is not in Chapter 11, to ensure the perpetual religious care of more than 500,000 deceased Catholics and the generations yet to be interred.

However, that is not the question of law to which the Committee devotes the first half of its principal brief. Instead, it challenges the impartiality of the federal judge who decided the case in the Trust's favor. His status is not the primary issue. The application of the law is—not just for this proceeding and this Trust but also for the families of deceased Catholics and for the sexual assault victims who largely

3

constitute the creditor class. Indeed, the federal statute at issue here is pending before the U.S. Supreme Court, in the context of the Affordable Care Act, where the questions surrounding the relationship between government and religion too are paramount.[3]

On June 28, 2011, the Trust commenced the adversary proceeding that provides the procedural framework for this appeal because uncertainty served neither the Trust nor the Archdiocese's creditors. Moreover, the constitutional and statutory questions presented by the Chapter 11 filing of a Catholic diocese or religious order—one of more than a dozen in the last decade—were inescapable.

When this Court hears oral argument, the Archdiocese's Chapter 11 proceeding will have been pending for more than 36 months. On February 12, 2014, the Archdiocese filed a proposed plan of reorganization—contingent, in part, on a $2 million line of fully secured credit from the Trust. It is contingent as well on the settlement of this litigation. In the meantime, hundreds of creditors' claims remain unresolved and professional expenses, including legal fees, total $12.5 million.

Nowhere is the Committee's approach to this dispute, here and in the federal courts in Milwaukee, more revealing than in its *ad hominem* attacks—on the judge and on the Archbishop: "There is reason to doubt Archbishop Listecki's sincerity in

---

[3] In *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114 (10th Cir.), *cert. granted*, 134 S. Ct. 678 (U.S. 2013) (No. 13-354), the Supreme Court will address RFRA's definition of "person" and the application of the substantial burden test to a for-profit corporation's religious choice to oppose compelled payment for contraception costs. This Court resolved those issues in *Korte v. Sebelius*, 735 F.3d 654 (7th Cir. 2013), *petition for cert. filed*, 82 U.S.L.W. ___ (U.S. Feb. 6, 2014) (No. 13-937), applying RFRA and finding it violated by the "contraception mandate." *See also University of Notre Dame v. Sebelius*, No. 13-03853 (7th Cir. filed Dec. 23, 2013) (argued Feb. 12, 2014).

this case, based on the actions of other bishops dealing with claims of survivors" of sexual assault by clerics. 7th Cir. Dkt. 32 ("Appellant Br.") at 33. That statement is followed, a few pages later, by the suggestion of intentional fraud, *id.*, at 40, contrasting this dispute with cases involving tithing where there is "no concern that debtors are intentionally tithing to defraud creditors." *Id.*

The Committee's counsel is free to doubt anyone's sincerity. It is not free to rely on hearsay, on guilt by association, or guilt by generalization. Moreover, evaluating religious sincerity, practices and standards, "[i]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." *Hernandez v. Commissioner*, 490 U.S. 680, 699 (1989); *see Korte v. Sebelius*, 735 F.3d at 677-78.

The path advocated by the Committee promises only more delay—whether through a remand to a different judge to decide again the same RFRA issues, or a remand to the same judge to decide again derivative legal questions, or a reversal and remand to decide questions of trust law. That delay will come at the expense, literally and figuratively, of the creditors here, including the hundreds of sexual assault victims who have filed claims. The summary judgment record permits this Court to resolve all of the federal statutory and constitutional questions immediately presented. The practical dimensions of the Chapter 11 proceeding, for the sake of the Debtor and its creditors and the Trust, should compel that resolution on this record and as a matter of law.

The Archdiocese of Milwaukee (the "Archdiocese" or "Debtor") was established on November 28, 1843. Sapp 267. It is both a Wisconsin non-stock corporation and a public juridic person under Codex Iuris Canonici or the Code of Canon Law (the "Code"), first published in 1917. *Id.* at 270. The mission of the Archdiocese is to serve Catholic parishes, schools and institutions so that they may effectively carry out their own religious missions in the community. *Id.* at 267. The Archbishop is Jerome E. Listecki, successor to former Archbishop, now Cardinal, Timothy M. Dolan. *Id.* at 264, 270.

### A.     Catholic Belief, Catholic Cemeteries And The Perpetual Care Trust.

As early as 1857, the Archdiocese began operating and maintaining Catholic cemeteries and mausoleums (collectively, the "Milwaukee Catholic Cemeteries"). Sapp 267 ("Listecki Decl."). Those Catholic burial facilities are all within the geographic boundaries of the Archdiocese, including individual burial plots, crypts, niches, and property dedicated to future use as burial facilities. *Id.* The Milwaukee Catholic Cemeteries encompass approximately 1,000 acres in which more than 500,000 individuals are interred. *Id.* About 3,000 burials take place each year. *Id.* at 266-267.

Under Church law,[4] cemeteries occupy land blessed and consecrated for the specific use of Christian burial. *Id.* at 267. They must be maintained in a manner befitting their sacred purpose with money set aside to provide that maintenance. *Id.*

---

[4] Church law includes Canon law, issued or authorized by the Pope, serving as the universal law of the Church. It also includes "particular law," the Catholic law governing the specific geographic area for which it was promulgated. Sapp 267-268. The Listecki Declaration refers to Canon law sections, and selected excerpts accompany this brief.

at 269. These expectations and requirements are reflected in the universal law of the Church and in the particular law of the Archdiocese. *Id.* at 269-270. The inclusion of the canons governing cemeteries in the 1917 Code and its successor in 1983 emphasizes the Catholic belief that cemeteries are sacred places, not mere property, a belief succinctly expressed in the Archdiocese's 1979 "Guidelines for Christian Burial":

> Not only is the Catholic cemetery a sacred place, a place of prayer, and a place reflecting our beliefs and traditions, it is also for the community a sign of the link among all the faithful, living and dead. It is recognition of that Faith which is shared by the dead buried there and the living who commit their deceased to this holy ground.

*Id.* at 269-270.

For Catholics, the belief in resurrection is a belief in the resurrection of one's own body. *Id.* at 265. The resurrection of the dead, of course, always has been an essential element of the Christian faith, beginning with Jesus' own resurrection. *Id.* According to this belief, the soul separates at death to meet God, awaiting reunion with its body on the last day, transformed and resurrected through the power of Jesus' resurrection. *Id.* at 265, 270, 271.

The sacred nature of Catholic cemeteries—and their compliance with the Church's traditions and mandates requiring their perpetual care—are a fundamental exercise of core belief. *Id.* at 265. Theologically, bodies must be treated with respect and charity in the Catholic faith and in the hope of resurrection. *Id.* at 271-272. Thus, in the Catholic tradition, perpetual care means much more than maintaining the grounds. Sapp 167. Sacred places, Catholic cemeteries are

arranged, adorned, and maintained to express core beliefs about death and the resurrection of the body. *Id.* In addition to features commonly found in secular cemeteries, the Archdiocese's cemeteries are consecrated and contain religious art and devotional features. *Id.*

Abiding by these religious traditions and mandates, the Archdiocese, for nearly a century, has set aside funds to provide for the perpetual care of its cemeteries. Sapp 267. Under Canon law, the Archdiocese has promised hundreds of thousands of Catholic faithful and their families to maintain the cemeteries in their faith and to devote a portion of the initial acquisition cost in trust for their perpetual care. Sapp 166-167.

In 2007, the Archdiocese furthered its perpetual care commitment by creating a formal trust under Wisconsin law for its long-held cemetery trust funds. Sapp 016-024, 267. Shortly afterward, then-Archbishop Dolan sought approval from the Vatican to transfer the perpetual care funds into the formal trust, noting he foresaw improved protection of the funds from "any legal claim and liability." Sapp 025. Around March 2008, with Vatican approval, then-Archbishop Dolan moved approximately $55 million that had gradually accumulated for the Milwaukee Catholic Cemeteries into the formal Trust. Sapp 033, 267. The Trust agreement mandates that its funds are not to be used for any purpose other than the exclusive benefit of the cemeteries, including investment for that purpose. Sapp 018.

Although Archbishop Listecki is now the administrator of both the Trust and the Archdiocese, the Trust is separate and distinct from the Archdiocese in Canon law and civilly. Sapp 270; Canon Law ("Can.")1254-58. The ownership and administration of the Trust funds reside in the Trust, not in the Archdiocese or with the Archbishop. Sapp 271; Can.1255-57.

By administering and holding funds for the Milwaukee Catholic Cemeteries, the Archdiocese and, subsequently, the Trust and Trustee are fulfilling canonical and moral responsibility for that perpetual care: under the Code, offerings given by the faithful for a particular purpose may only be applied for that purpose. Sapp 272, Can.1267 §3. The Trust is a public juridic person under Canon law, subject to the ecclesiastical authority of the Archbishop of Milwaukee and the Church. Sapp 270; Can.116 §1. If funds are alienated from the Trust without the required canonical compliance and approvals, the Archbishop as Trustee may well face religious discipline and penalty. Sapp 273-274; Can.1290-92, 1377.

Archbishop Listecki, as Archbishop and Trustee, believes in the resurrection of the body and that belief's exercise through, among other things, the perpetual care of the Milwaukee Catholic Cemeteries. Sapp 270, 274. If the Trust can be judicially compelled to turn over its funds to the estate, the Trustee cannot freely and independently meet his canonical and moral obligations—defined by his faith—for these sacred sites or assure the requisite permanence, reverence and respect for those buried there. *Id.* at 273-275.

### B.    Procedural History.

The Archdiocese filed its Chapter 11 petition on January 4, 2011 (Case No. 11-20059-SVK). The Trustee filed this adversary proceeding about six months later, seeking a declaration that neither the Trust nor its funds can be property of the bankruptcy estate. Sapp 147-154. The Bankruptcy Court granted the Committee (appointed by the Department of Justice's U.S. Trustee under 11 U.S.C. § 1102) derivative standing to answer and litigate its own avoidance and turnover counterclaims (under 11 U.S.C. §§ 542, 544, 547, 550) against the Trustee. R.13-1 at 38-43, 44-46; Sapp 155-163. The parties agreed that, if not for the Court's order approving their derivative standing stipulation, the Committee could not bring avoidance and turnover counterclaims because those claims belong to the Debtor's estate. R.13-1 at 38-43; Sapp 155-163.

An amended complaint substituted Archbishop Listecki in his capacity as Trustee, in place of the Trust, as plaintiff and added claims. Sapp 001-15. With his third claim, the Trustee sought a declaration that both the First Amendment and RFRA preclude a determination that the Trust or its funds can be property of the estate because using the Trust funds to pay the Debtor's creditors "would substantially burden [his] sincere religious exercise." ("Count III"). *Id.*

The Committee filed a partial summary judgment motion on May 25, 2012, limited to Count III and several of the Committee's related affirmative defenses. Sapp 170-173. In support of its own motion, the Committee's counsel chose to file a single affidavit, submitting only a copy of the 2007 agreement that formalized the trust structure. Sapp 174-200; Sapp 201-213. With its response, the Trust

submitted the Declaration of Archbishop Jerome Listecki—attesting to, among other things, the importance of cemeteries and their care within the Catholic faith, his ecclesiastical responsibilities, and the substantial burdens any transfer of the Trust's funds to the Debtor's estate would impose on the Trustee personally, the Trust and the Debtor. Sapp 264-275.

The Trustee also supported the response with a statement of proposed material and undisputed facts pursuant to Local Rule 56(b)(1), noting the Committee's failure to similarly comply with local rules. Sapp 257-263. Though the Trustee did not file his own summary judgment motion, the Trustee's response brief requested judgment pursuant to Fed. R. Bankr. P. 7056 and Fed. R. Civ. P. 56(f)(1). Sapp 229-231.

At an October 18, 2012 status conference, the Committee's counsel first told the Bankruptcy Court that the substantial burden issue, a component of both RFRA and First Amendment analysis, was "factually intensive." Sapp 293. It would require discovery because "if you took all the money out of the Cemetery Trust and used it possibly for other purposes[,]…you could still give adequate care to the cemeteries and not substantially burden religion." Sapp 292-293.

The Trustee has never conceded that the "substantial burden" question required further discovery. However, based on the Committee's representation, the Bankruptcy Court's minute order set aside issues that allegedly required discovery. *Id.* at 327. Yet, the Committee continued to press for a finding of no substantial burden. Sapp 345-346 (arguing the Trust "cannot show a substantial burden here").

11

The Bankruptcy Court heard argument on January 11, 2013 and, again, counsel for the Committee emphasized that substantial burden is "the threshold question of every RFRA case," and "none of the Trustee's arguments meet the standard." R.13-7 at 158 and 17:8, 17:12-14. Contrary to the position it had taken at the October status conference, the Committee then asserted that "substantial burden" is an issue of law that does not require discovery as to cost:

> Judge Posner, in dissent in the *Club* [*Civil Liberties for Urban Believers v. City of Chi.*, 342 F.3d 752 (7th Cir. 2003)] case, essentially said that the religious groups should have special financial privileges, in the context of land use law. It's basically socialism for churches.…But the majority in *Club*…ha[s] said that's not the standard. The standard isn't if there's a cost. The fact that it's expensive, that they might have to pay a financial penalty is not a substantial burden.

R.13-7 at 159 and 18:7-24. The Committee reiterated the same point for its First Amendment defense: "Whether or not something is an incidental burden…is a matter of law, it is not a matter of fact." *Id.* at 47:20-23 and R.13-7 at 188.

From the bench on January 11 and in a written decision and order dated January 17, 2013, the Bankruptcy Court granted the Committee partial summary judgment. Sapp 352-363, 364. The court concluded that RFRA and the First Amendment did not apply in the first instance and, accordingly, it did not analyze the substantial burden issue. Sapp 353. The Bankruptcy Court did not enter any findings of fact or conclusions of law, proposed to the District Court or otherwise.

The Trustee timely filed a Motion for Leave to Appeal or to Withdraw the Reference or, Alternatively, Trustee's Objections to Bankruptcy Court's Proposed

Findings of Fact and Conclusions of Law.[5] 7th Cir. Dkt. 1; *see also* R.13-7

at 221-278; R.13-7 at 279-282. The District Court "preliminarily" granted the

Trustee leave to appeal, permitting the parties to further brief the issue. R.2. The

Trustee then designated the appellate record for the District Court, including the

Listecki Declaration. R.13-8 at 74-100. The Committee submitted its own

counterstatement of issues on appeal, which included:

> Does a religious organization's choice to file voluntarily a
> petition under chapter 11…to protect its assets impose
> only an incidental burden on the free exercise of religion,
> and, therefore, bar a RFRA claim?

R.13-8 at 101-105.

The District Court entered a Decision and Order (the "Decision") on July 29,

2013, holding that RFRA and the First Amendment prevent the Committee from

reaching the Trust's funds. App 029-30, Decision. On August 1, the District Court

entered summary judgment for the Trustee (Fed. R. Civ. P. 56(f)(1)), dismissing the

remaining claims in the adversary proceeding. App 031-32. That ended the case, if

only momentarily.

Within a few days of the Decision, the Committee, by searching publicly

available databases, said it "discovered that at least nine of Judge Randa's

relatives…are buried in cemeteries owned and operated by the Debtor." Sapp 497;

App 038. The Archdiocese's business records disclosed an agreement signed in 1975,

17 years before Judge Randa became a federal judge, to purchase burial rights for

---

[5] The motion was captioned to avoid any uncertainty about whether the Bankruptcy Court's
decision and order would be treated as proposed findings of fact and conclusions of law,
though they were not.

his parents in an Archdiocese-owned crypt. Sapp 483-485. Based on these "new"

facts, the Committee moved to vacate the Decision (the "Motion to Vacate") and

separately moved to recuse Judge Randa from any cemetery trust litigation.

Sapp 419-421; Sapp 490-492.

With the post-judgment motions pending, on August 26, 2013, the Committee

filed a notice of appeal with this Court. R.36; *see generally* 7th Cir. Dkt. 1. The

District Court denied the motions on October 1. App 036-44. Afterword, the

Committee filed its Petition for Writ of Mandamus and filed an amended notice of

appeal.

## SUMMARY OF ARGUMENT

RFRA bars the Committee's federal avoidance and turnover claims. As

"government," acting under color of law, the Committee may not "substantially

burden" the Trustee's exercise of religion unless it can demonstrate that the burden

furthers a compelling government interest using the least restrictive means. This

statutory mandate, applicable to the Committee and its claims, should compel the

conclusion that the Trust's assets cannot be reached in the Archdiocese's separate

Chapter 11 proceeding.

The Committee falls within RFRA's definition of "government" because it is

quintessentially a creature of federal bankruptcy law, a "state actor" that enjoys

qualified immunity and, in this case, fulfills unique fiduciary duties to the

bankruptcy estate. Moreover, *City of Boerne v. Flores*, 521 U.S. 507 (1997), does not

preclude RFRA's application because the Committee's claims are grounded not in

14

state law but in federal bankruptcy law, enacted pursuant to Congress's enumerated powers.

If a secular court orders the Trustee to alienate the Trust, as the Committee requests, it would violate his sincerely held belief (and obligations under Canon law) that the Trust's assets must be preserved for the perpetual religious care of the Catholic faithful. The Committee would have the Trustee endure this burden to enlarge the Debtor's bankruptcy estate, which is neither a compelling government interest nor one achieved by the least restrictive means.

RFRA aside, the First Amendment's free exercise clause also prevents the Committee from invading the Trust. The Bankruptcy Code provisions at issue lack facial neutrality, already carving out religious and charitable contributions from the reach of bankruptcy law.  Moreover, the effect of the avoidance and turnover provisions is not "merely incidental." Strict scrutiny applies, and the statutory provisions the Committee would employ are not narrowly tailored to serve a compelling government interest.

Finally, the Committee's motions to vacate the Decision and recuse Judge Randa are baseless. Premised upon information publicly available long before the District Court issued its Decision, the motions should be denied as untimely. Moreover, they are without merit. Judge Randa purchased his parents' burial rights 38 years ago, and he is in no way contractually obligated to care for the sites. He has no impermissible interest in this litigation, and any reasonable person would not conclude otherwise. The Committee's dissatisfaction with the well-reasoned

Decision is not a ground to vacate it. The motions should be denied, and the District

Court's judgment affirmed.

## ARGUMENT

### I.    RFRA APPLIES TO THE FEDERAL TURNOVER AND AVOIDANCE CLAIMS BROUGHT BY THE COMMITTEE.

The first question of law this Court will address can be starkly drawn. RFRA

either applies to the Committee or it does not. Under RFRA, "[g]overnment" may

not "substantially burden a person's exercise of religion even if the burden results

from a rule of general applicability" unless it can satisfy strict scrutiny. 42 U.S.C.

§ 2000bb-1(a), (b) (2012). This Court in *Korte v. Sebelius*, 735 F.3d 654, late last

year summarized RFRA's genesis and purpose: it enhances "religious liberty" by

"creat[ing] a broad statutory right to case-specific exemptions from laws that

substantially burden religious exercise *even if* the law is neutral and generally

applicable, *unless* the government can satisfy the compelling-interest test." *Id.*

at 671 (emphasis in original).

Unlike the Affordable Care Act, which did not define the pivotal term "person,"

RFRA does define "government." It includes any "official" or any "other person

acting under color of law." Here, if the Committee acts under "color of law," RFRA

applies. If, conversely, as the Committee argues, it is simply a "private party," *e.g.*,

Appellant Br. at 10, 23, then RFRA does not apply.

The District Court held that the Committee falls within RFRA's definition of

"government" because it acts under color of law. The Committee challenges this

conclusion of law because it says it "is a collection of independent, individual,

16

private creditors of the Debtor who represent the interests of a larger class of unsecured, private creditors and has a fiduciary duty to protect their [private] interests." Appellant Br. at 23. This assertion ignores both fact and law.

### A. The Committee Is Subject To RFRA Because, At A Minimum, It Acts Under Color Of Law.

The only thing "private" about the Committee is the individual status of its individual members. But for the Bankruptcy Code, it would not exist. But for the Bankruptcy Code, it would not have standing to try to invade the Trust's assets. But for the Bankruptcy Code, it could not retain counsel. Nor would it have immunity. Indeed, it styles itself the "Official Committee of Unsecured Creditors" under 11 U.S.C. § 1102 for a reason. While the phrase does not connote "government" quite like the FBI or the IRS, it is difficult to imagine another collection of individuals that conducts itself more like "government" and more "under color of law" than this government-created, government-supervised, government-empowered, statutorily-protected entity.

Under RFRA, a party is "government" if it is "a branch, department, agency, instrumentality, and official (*or other person acting under color of law*) of the United States." 42 U.S.C. § 2000bb-2(1) (emphasis added). The required degree of state action necessary to qualify as "color of law" conduct under RFRA is the same standard that must be met under 42 U.S.C. § 1983. *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 835 (9th Cir. 1999) (citing *Brownson v. Bogenschultz*, 966 F. Supp. 795, 797 (E.D. Wis. 1997)). Accordingly, under RFRA, a party is

17

"government" when its conduct may be "fairly attributable" to the state.[6] *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982) (interpreting "color of law" under the Civil Rights Act).

Conduct is fairly attributable to the state under two conditions: first, when there is "the exercise of some right or privilege created by the [s]tate…or by a person for whom the [s]tate is responsible" and, second, when the party charged with the deprivation "may fairly be said to be a state actor." *Id.* For example, statutory prejudgment attachment and execution on property by private parties are the "product of state action." *Id.* at 941. Similarly, the very ability to seek a court order to transfer assets into a bankruptcy estate is purely the product of Congressional action, grounded in the bankruptcy clause of Article I, Section 8. That provides the first element of the "color of law" test. *See* 28 U.S.C. § 1334(e) (district court's exclusive jurisdiction over a bankruptcy debtor's property); *United States v. Chrystal Evangelical Free Church* (*In re Young*), 82 F.3d 1407, 1418 (8th Cir. 1996) (*Young II*) (Bankruptcy Code pursuit of fraudulent transfers for a bankruptcy estate is "governmental action" that triggers RFRA), *vacated sub nom. Christians v. Crystal Evangelical Free Church*, 521 U.S. 1114 (1997).

Without "something more," conduct by a party pursuant to statute is arguably insufficient by itself to justify "state actor" status. *Lugar*, 457 U.S. at 939. Courts

---

[6] The term "state" used in *Lugar* also encompasses action under color of federal law. *See Reuber v. United States*, 750 F.2d 1039, 1057 (D.C. Cir. 1984); *Ginn v. Mathews*, 533 F.2d 477, 480 n.4 (9th Cir. 1976); *Taunt v. Barman (In re Barman)*, 252 B.R. 403, 412 (Bankr. E.D. Mich. 2000).

have used a number of different tests to determine whether a party's conduct has

that "something more." *See Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816,

823-24 (7th Cir. 2009) (internal citations omitted). While this Court has not adopted

any one particular test, "[a]t its most basic level, the state action doctrine requires

that a court find such a close nexus between the State and the challenged action

that the challenged action may be fairly treated as that of the State itself." *Id.*, 823,

826-27 (internal citations omitted).

The Bankruptcy Code provisions defining a Chapter 7 trustee's status create a

nexus sufficiently close to the government to establish state action. *Barman*, 252

B.R. at 412. The court in *Barman* asked whether a trustee's inspection of a debtor's

residence to look for estate assets was subject to the Fourth Amendment's limits on

government power. It was. The statutory provisions governing the trustee's status

demonstrated "a relationship sufficiently close to the government…even though the

trustee [a private attorney] is not technically an employee of the government." *Id.*

at 412 (noting that, by statute, trustees are appointed and supervised by the U.S.

Trustee who has removal authority; the trustee's fees and professionals are subject

to court approval as well).

Like a bankruptcy trustee—indeed, more so—the Committee qualifies as a "state

actor." The Committee is appointed by the U.S. Trustee (a government employee)

pursuant to statutory mandate and subject to court approval. 11 U.S.C.

§ 1102(a)(1), (4); *see Blixseth v. Brown*, 470 B.R. 562 (D. Mont. 2012) (committee

members are functionally equivalent to court appointed officers), citing *Lawrence v.*

*Goldberg*, 573 F.3d 1265, 1269 (11th Cir. 2009). Once appointed, the Committee is monitored by the U.S. Trustee. 28 U.S.C. § 586(a)(3)(E). Unlike the status of any other "party in interest," moreover, the Bankruptcy Court may also order the U.S. Trustee to change the Committee's membership. 11 U.S.C. § 1102(a)(4); *see also In re SPM Mfg. Corp.*, 984 F.2d 1305, 1317 (1st Cir. 1993) ("the bankruptcy court always retains the power to monitor and control the tenor of reorganization proceedings"). The Committee members' expenses are subject to court approval, which by law may only be reasonable and necessary. 11 U.S.C. § 503(b)(3)(F). The Committee may employ attorneys or other professionals but, again, only with court approval, 11 U.S.C. § 1103(a), and those professionals' expenses are similarly subject to court approval, 11 U.S.C. § 503(b)(2).

Critically, the Bankruptcy Court also has the power to withdraw the Committee's derivative standing in this proceeding (standing expressly given by the Bankruptcy Court in the first instance), and it could do so even in the absence of the Committee's consent. *Official Comm. of Equity Sec. Holders v. Official Comm. of Unsecured Creditors (In re Adelphia Commc'ns Corp.)*, 544 F.3d 420, 423 (2d Cir. 2008). In short, no less than a private bankruptcy trustee, "every aspect of [the Committee's] position and function is subject to either statutory obligation or to federal executive or judicial branch control." *Barman*, 252 B.R. at 412.

The Committee has attempted to distinguish *Barman* by arguing that the trustee there was acting under color of law only because the U.S. Marshal had accompanied the trustee on the search of the debtor's residence. *Id.* at 411. Yet the

court did not rely on the U.S. Marshal's presence. In fact, the court specifically concluded that "the other circumstances surrounding such an order [apart from the assistance of the U.S. Marshal] are sufficient to justify the conclusion that in either event the fourth amendment applies." *Id.* at 413 n.6; *see also Youngman v. Bursztyn (In re Bursztyn)*, 366 B.R. 353 (Bankr. D.N.J. 2007) (same).

The Committee's status as a state actor is reflected as well in the qualified immunity it enjoys while performing its statutory duties. Only parties acting under color of law are entitled to qualified immunity. *Wyatt v. Cole*, 504 U.S. 158, 167-68 (1992) ("[q]ualified immunity strikes a balance between compensating those…injured by official conduct and protecting government's ability to perform its traditional functions....These rationales are not transferable to private parties."). A creditors' committee has qualified immunity, *Pan Am Corp. v. Delta Air Lines, Inc.*, 175 B.R. 438 (S.D.N.Y. 1994), "[b]ecause of its central statutory role in the Chapter 11 process, and to assure the effective representation of its constituency." *Id.* at 514; *see also Philip v. L.F. Rothschild Holdings (In re L.F. Rothschild Holdings)*, 163 B.R. 45, 49 (S.D.N.Y. 1994).

Specifically, a creditors' committee has qualified immunity when pursuing claims on behalf of the estate. *See, e.g., In re Walnut Equipment Leasing Co.*, No. 97-19699DWS, 2000 WL 1456951, at *4 (Bankr. E.D. Pa. Sept. 22, 2000) ("the Committee was authorized to commence avoiding actions. It did so, and is entitled to immunity for its actions."). Try as it might, the Committee cannot refute the unassailable conclusion that because it enjoys qualified immunity, it necessarily

acts under color of law. The Committee cannot have it both ways—court-approved status, power and immunity but "private" status for RFRA.

Even if the Committee were not a stand-alone public actor, the Committee's court-ordered standing to pursue the Trust's assets on behalf of the bankruptcy estate itself creates a nexus sufficient for state action. In *Young II*, 82 F.3d at 1420, the U.S. Court of Appeals applied RFRA to preclude the trustee from avoiding the debtors' religious tithes as fraudulent transfers under 11 U.S.C. § 548(a)(2)(A). In reaching its conclusion, the court explained that "[t]he threshold inquiry under the RFRA is whether *the governmental action in question* 'substantially burdens' a person's religious practice." *Id.* at 1418. The Bankruptcy Court here has given the Committee authority to do precisely the same thing: to claim assets for the bankruptcy estate. R.13-1 at 38-43, 44-46; Sapp 155-163.

This "governmental action" is no different than the governmental action in *Young II* and no different than the governmental action in *Morris v. Midway Southern Baptist Church (In re Newman)*, 183 B.R. 239 (Bankr. D. Kan. 1995), *aff'd*, 203 B.R. 468 (D. Kan. 1996) (applying RFRA to bankruptcy trustee bringing fraudulent conveyance action under 11 U.S.C. § 548(a)). In addition, the bankruptcy court in *Tort Claimants Comm. v. Roman Catholic Archbishop* (*In re Roman Catholic Archbishop*), 335 B.R. 842 (Bankr. D. Or. 2005), applied RFRA to a committee that brought an avoidance claim against an archdiocese. It was not even a contested issue in the case: RFRA applied.

The Committee's derivative status, court-authorized to stand in the shoes of the debtor-in-possession, makes no difference—indeed, it reinforces the analysis. When a company files a Chapter 11 petition, it causes a "fundamental *legal change* in the entity." *In re V. Savino Oil & Heating Co.*, 99 B.R. 518, 524-25 (Bankr. E.D.N.Y. 1989). The debtor-in-possession "becomes an officer of the court subject to the supervision and control of the Bankruptcy Court...." *Id.* A debtor-in-possession "has the same fiduciary duties as a trustee appointed by a court...hold[ing] its powers in trust for the benefit of creditors." *Id.* Here, the Bankruptcy Court explicitly vested the Committee with the debtor-in-possession's authority as an "officer of the court."

The Committee argues that the District Court misapplied *Jackson v. Metro. Edison Co.*, 419 U.S. 345 (1974), when it found "color of law" because *Jackson* requires the delegation of a right exclusively held by a public actor. Appellant Br. at 26. To the contrary, the public function test is only one formulation the Supreme Court has used to find state action, and the Committee's statutory status alone renders it a government actor apart from any exclusivity test.

Even assuming the "public function" test requires delegation of a right exclusively held by government, moreover, that test is met here. The Bankruptcy Court, the debtor-in-possession, and the U.S. Trustee or private trustee are all public actors unique to federal bankruptcy law. Delegation of the "governmental action"—pursuing claims on behalf of the bankruptcy estate—is a function exclusively reserved for these actors. *Young II*, 82 F.3d at 1420. Indeed, it is the

very ability of the Committee to speak collectively—for all of the creditors—that is unique and available *only* because a federal court and a federal law have made it so.

"Color of law" status aside, this Court could conclude that RFRA applies to the Committee as a private party because RFRA also applies to suits between private parties. *See* Shruti Chaganti, *Why the Religious Freedom Restoration Act Provides a Defense in Suits by Private Plaintiffs*, 99 Va. L. Rev. 343, 348-63 (2013). The Trust made that argument in the District Court, which had no need to reach it. R.16 at 24-28. Neither does this Court. At a minimum, the Committee acts under color of law by bringing its claims against the Trustee—claims reserved for Bankruptcy Code-created, court-appointed fiduciaries of the bankruptcy estate.

The Committee is "something more" than a collection of independent, individual, private creditors. Every aspect of its statutorily-created role is subject to Bankruptcy Court and U.S. Trustee oversight. And, in this case, the Bankruptcy Court granted the Committee specific authority to pursue avoidance and turnover claims. The Committee cannot escape its delegated role as a public fiduciary, subject to RFRA.

### B.     Applying RFRA To The Committee's Claims Is An Appropriate Exercise Of Federal Law.

In *City of Boerne*, 521 U.S. 507, the Supreme Court held RFRA unconstitutional as applied to state law because Congress had exceeded its enforcement powers under section 5 of the Fourteenth Amendment. *O'Bryan v. Bureau of Prisons*, 349 F.3d 399, 400-01 (7th Cir. 2003) (explaining *Boerne*). The enforcement power is remedial, only allowing Congress to preserve rights already protected by the

Fourteenth Amendment. *Christians v. Crystal Evangelical Free Church* (*In re Young*), 141 F.3d 854, 858 (8th Cir. 1998) ("*Young III*").

Notably, the Supreme Court did not hold that Congress could not constitutionally impose RFRA on the *federal* government. In applying RFRA federally, Congress relied on its enumerated powers in Article I, rather than its Fourteenth Amendment enforcement powers. *Young III*, 141 F.3d at 858 (citing H.R. Rep. No. 103-88, at 17 (1993) ("Finally, the Committee believes that Congress has the constitutional authority to enact [RFRA]. Pursuant to…the Necessary and Proper Clause embodied in Article I, Section 8 of the Constitution, the legislative branch has been given the authority to provide statutory protection for a constitutional value....")). Since *Boerne*, as this Court noted, "[e]very appellate court that has squarely addressed the question has held that the RFRA governs the activities of federal officers and agencies." *O'Bryan*, 349 F.3d at 401 (collecting cases).

RFRA's application to the Committee and its counterclaims does not involve Congressional enforcement power, nor does it impair state law. Indeed, it is long settled that Congress may lawfully exercise its legislative power under the Article I, Section 8, Bankruptcy Clause through reference to local law. *Hanover Nat'l Bank v. Moyses*, 186 U.S. 181, 190 (1902) ("Nor can we perceive in the recognition of the local law in the matter of exemptions…any attempty [*sic*] by Congress to unlawfully delegate its legislative power."). Congress has done so by allowing trustees to pursue transfers otherwise voidable under "applicable law." 11 U.S.C. § 544(b)(1).

To the extent state law is relevant, in theory or in practice here, it is relevant only because federal law first makes it so.

Yet the Committee maintains that *Boerne* precludes application of RFRA to its claims, all grounded in federal law. While section 541 refers to state law to help determine property interests, the threshold question of whether the property can be brought into the bankruptcy estate—created by federal law—is determined solely by the Bankruptcy Code. And it is the Bankruptcy Code that gives the trustee, here the Committee, the power to try to "avoid any transfer of an interest of the debtor in property...voidable under applicable law by [an unsecured creditor]." 11 U.S.C. § 544(b)(1).

The Committee tries to distinguish *Young III*—the Eighth Circuit case applying RFRA in the context of Bankruptcy Code section 548—by arguing that the provision does not specifically incorporate state law quite like section 544 does. Appellant Br. at 39. The Committee misses two points: why *Young III* is instructive and why it supports the Trustee. The Eighth Circuit concluded "that RFRA is an appropriate means by Congress to modify the United States bankruptcy laws." 141 F.3d at 861. RFRA's application is not limited to section 548—it applies to all bankruptcy laws.

The ultimate issue of whether property can be brought into the bankruptcy estate is governed solely by the Bankruptcy Code, enacted pursuant to Congress's enumerated powers. Applying RFRA to the Committee's claims would not modify or invalidate state law in violation of the Supreme Court's mandate in *Boerne*.

## II.    RFRA PRECLUDES THE COMMITTEE FROM REACHING THE TRUST.

It is not enough, of course, to find that the Committee is subject to RFRA as a "government" entity acting under color of law. That is a necessary but not sufficient condition for this Court to affirm the District Court's decision and the Trustee's position. To violate RFRA, the Committee's attempt to reach the Trust's assets must "substantially burden" the free exercise of religion without a compelling interest or in a manner not the least restrictive available.

### A.    The "Substantial Burden" Question Posed By An Avoidance And Turnover Claim Can And Should Be Decided Now.

The Committee contends the "substantial burden" issue was "not raised squarely" in the Bankruptcy Court and, thus, not properly part of this appeal. The Committee misreads the record, the federal procedural rules, and the law. In fact, the Committee itself first raised the substantial burden issue and asked the Bankruptcy Court to decide it. The Committee's partial summary judgment motion attacked Count III of the Trustee's amended complaint, which includes an explicit assertion that any turnover of Trust funds would impose a substantial burden on the Trustee's sincere religious exercise.

The Committee initially argued that, by definition, there could be no substantial burden in allowing its counterclaims to go forward "because outside of bankruptcy any creditor…could sue the [Trustee] to avoid the transfers...unimpeded by RFRA." Sapp 192-193. The Trustee, accordingly, had to address the Committee's argument or risk waiving it. Summary judgment is "the 'put up or shut up' moment in a lawsuit" requiring the non-movant to come forward with evidence. *Eberts v.*

*Goderstad*, 569 F.3d 757, 766-67 (7th Cir. 2009). The Trustee did just that; the Committee did not.

The Committee's partial summary judgment motion included a single affidavit—the Trust agreement. In its response brief, the Trustee complied with the local rules by submitting proposed findings of fact and the Listecki Declaration. In contrast, the Committee's counsel made a calculated decision not to offer any other evidence—either in support of its motion or in reply to the Trustee's materials.

Notwithstanding its claim that it asked the Bankruptcy Court to defer the "substantial burden" issue for discovery, the Committee continued to press for a substantial burden finding—in its summary judgment reply and at oral argument. *E.g.*, Sapp 345-346 (arguing "[t]he Trust cannot show a substantial burden here"); R.13-7 at 158 and 17:10-17:14 ("there's no substantial burden because…[they] could [not] even remotely argue that their religious practices become impracticable, which is the standard.").

The Bankruptcy Court's decision not to reach the substantial burden question was not because the parties did not raise, brief, and argue the issue. Instead, the Bankruptcy Court determined that RFRA and the First Amendment did not apply in the first instance. But that did not make the issue disappear, especially in light of the District Court's plenary jurisdiction.

Trying to divert attention from its evidentiary failure, the Committee suggests the District Court improperly reached the substantial burden issue. The Committee has suffered an injustice, it argues, because it did not have the opportunity to refute

the Trustee's assertions. To the contrary, the Committee had serial opportunities to address the Trustee's evidentiary submissions, including in its reply to the Trustee's summary judgment response. Moreover, after the District Court preliminarily granted leave to appeal, the Trustee designated the Listecki Declaration for the record and included the substantial burden question in its issue statement. R.13-8 at 74-100. The Committee then submitted a counterstatement of issues that explicitly included the burden question as well. *Id.* at 101-105.

The Committee's arguments are moot in any event. The District Court withdrew the reference to the Bankruptcy Court on the RFRA and First Amendment claims, App 010, Decision, which necessarily included the burden on the Trustee's religious exercise. The District Court was no longer exercising its appellate jurisdiction, and it was never limited to what the Bankruptcy Court did or did not do. *See Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 736 (7th Cir. 2006) (court can grant summary judgment on any grounds that parties raised and had opportunity to brief).

The Committee's counsel made a series of strategic choices not to submit evidence or even proposed facts despite repeated opportunities. The Committee has suffered no injustice, and it has no one but itself to blame for the fact that the Listecki Declaration is "uncontroverted" in the record. This issue is ripe, and it should be decided now.

### B.     The Trustee Has Demonstrated A Substantial Burden On The Free Exercise Of Religion.

Even independent of the Listecki Declaration, the core Catholic beliefs and obligations under Canon law are undisputable. Indeed, the Committee cannot define, to its liking, Catholic faith and doctrine. This Court can and should conclude, as a matter of law, that the Trustee has demonstrated a substantial burden on his religious exercise.

For RFRA, a substantial burden on the free exercise of religion is one that

> forces adherents of a religion to refrain from religiously motivated conduct, inhibits or constrains conduct or expression that manifests a central tenet of a person's religious beliefs, or compels conduct or expression that is contrary to those beliefs.

*Mack v. O'Leary*, 80 F.3d 1175, 1179 (7th Cir. 1996), *vacated on other grounds*, 522 U.S. 801 (1997). Religious practices that are not mandatory may nonetheless be "important to their practitioners, who would consider the denial of them a grave curtailment of their religious liberty." *Id.*; *see also Thomas v. Review Bd. Of Ind. Emp't Sec. Div.*, 450 U.S. 707, 718 (1981) (finding a substantial burden where the state "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs").

This Court has rejected the more restrictive definitions of substantial burden— those grounded in determining whether an act literally compels conduct a religion forbids. *Mack*, 80 F.3d at 1179. Judge Posner criticized the more restrictive approach because it requires "the courts to determine what practices the plaintiff's religion obligates him to follow, and this is an issue of religious law…." *Id.* This

Court has emphasized "the undesirability of making judges arbiters of religious law" and, just last year, it affirmed this approach in *McCarthy v. Fuller*, again concluding that a secular court cannot take sides on issues of religious doctrine. "Religious questions are to be answered by religious bodies." 714 F.3d 971, 976 (7th Cir. 2013).

Even more recently, this Court noted that "[i]t is enough that the claimant [here, the Archbishop] has an 'honest conviction' that what the government [here, the Committee] is requiring, prohibiting, or pressuring him to do conflicts with his religion." *Korte*, 735 F.3d at 683. The "judicial duty" to "decide substantial-burden questions under RFRA does not permit the court to resolve religious questions or decide whether the claimant's understanding of his faith is mistaken." *Id.* at 685.

Subsequent to *Mack*, Congress enacted the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), which broadly defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). This definition, now expressly incorporated by RFRA, § 2000bb-2(4), has "prompted a renewed consideration of what constitutes a substantial burden." *Koger v. Bryan*, 523 F.3d 789, 799 (7th Cir. 2008); *see generally Korte*, 735 F.3d at 682-83.

In the "context of RLUIPA's broad definition of religious exercise, a land-use regulation that imposes a substantial burden…is one that necessarily bears direct, primary, and fundamental responsibility for rendering religious exercise—including the use of real property…—effectively impracticable." *Civil Liberties for Urban*

*Believers v. City of Chi.*, 342 F.3d at 761 ("*CLUB*"). The standard articulated in

*CLUB* is not inconsistent with the standard in *Mack*, though *Mack* is more

applicable here because it does not involve land use. *See Koger*, 523 F.3d at 799 ("In

determining when an exercise has become 'effectively impracticable,' it is helpful to

remember that…the Supreme Court held that a government imposes a substantial

burden…when it 'put[s] substantial pressure on an adherent to modify his behavior

and violate his beliefs'") (quoting *Thomas*, 450 U.S. at 718). Under either

formulation, the religious practice need not be mandatory or central to a belief

system to be burdened in violation of RFRA. The heart of the "substantial burden"

question is the "intensity" of the coercive effect of government action on religious

belief. 735 F.3d at 683. It is not a financial test.

Regardless of nuance, a turnover or avoidance order would impose a substantial

burden on the Trustee's sincere religious exercise.  The Catholic Church, like other

faith communities, considers the cemetery sacred—directly related to the Church's

belief in the resurrection of the body at the final consummation. *See* Sapp 265. The

perpetual care of Catholic cemeteries has always been a fundamental exercise of the

Catholic faith. Sapp 268-269. The Church's laws, as well as its historical and

religious traditions, require that care and, accordingly, that money be set aside for

that purpose as it historically has been. *Id.* To further protect these trust funds,

Archbishop Dolan placed them in a formal trust—where no one, neither the

Archdiocese's creditors nor anyone else, could use them for any purpose other than

religious perpetual care.

A secularly-mandated turnover of funds to the bankruptcy estate, for the benefit of secular creditors, would compel the Trustee to use the funds for a purpose other than that for which they were entrusted—contrary to his beliefs, in violation of his fiduciary obligation to the Catholic faithful, and at the risk of religious discipline. Sapp 270-272, 274-275; *see United States v. Ali*, 682 F.3d 705 (8th Cir. 2012) (requiring defendant to stand when court convened and recessed—in contravention of her religious beliefs—constituted a substantial burden under RFRA). Compelling the transfer of a single dollar would compel the Trustee to engage in conduct contrary to his fundamental beliefs and the Trust's obligations—making his religious exercise, at the least, impracticable.

The Committee would have this Court believe that the District Court interpreted the substantial burden test as "satisfied according to whatever the believer says it is." Appellant Br. at 32. To the contrary, consistent with *McCarthy v. Fuller*, the District Court concluded that the Trustee, an Archbishop of the Catholic Church, has offered an authoritative statement of core Catholic beliefs and his own duties under Canon law.

A federal court must take extraordinary care when "religious questions"— interpretations of the Catholic Church's religious doctrine—are at issue. *McCarthy*, 714 F.3d at 976; *see Korte*, 735 F.3d at 685. Although a court may still decide whether *is* an authoritative church position on an issue—as this Court has done—a religious doctrine, interpretation or practice removes the issue from the court's jurisdiction. *McCarthy*, 714 F.3d at 976. Notwithstanding the District

Court's reasoning and reliance on *McCarthy*, the Committee omits in its brief any citation to it, let alone any discussion of it or the *Korte* decision.

Archbishop Listecki's uncontroverted statements about his religious obligations are independently supported by Church law. With or without his Declaration, "the issue of [Catholic] doctrine is unassailable." Sapp 026, Decision. While there is no need to brief Catholic Canon Law—the decisions in *Korte* and *McCarthy* leave no doubt about that—the addendum accompanying this brief provides excerpts. The Church provides, by its own law, for the ownership and administration of real and personal property with limits on the authority of a bishop to transfer property. Ultimately, those limits are established ecclesiastically by the Church and by the Vatican.

The Committee attempts to cast doubt on the Archbishop's "sincerity" through a citation to a newspaper article about sexual assault claims and the response by another bishop. R.19 at 33. Assuming the "citation" is appropriate and its reporting accurate, anything other bishops have or have not done under other circumstances is irrelevant to the inquiry here: "[i]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." *Hernandez*, 490 U.S. at 699; *see also Korte*, 735 F.3d at 677-78.

This Court should not question whether this Archbishop correctly interpreted his obligations—then or now—under Canon law. But Canon law leaves no doubt

about the requirements of the Catholic faith. The Trustee cannot alienate the funds in disregard of Canon law and absent approval from the Holy See.

### C.   The Bankruptcy Code's Avoidance And Turnover Provisions Do Not Serve A Compelling Government Interest, Much Less An Interest Advanced By Least Restrictive Means.

In light of this substantial burden, the burden of persuasion falls to the Creditors' Committee to show that the Bankruptcy Code provisions at issue are "(1) in furtherance of a compelling government interest; and (2) the least restrictive means of furthering that compelling government interest." 42 U.S.C. § 2000bb-1(b). This, the Committee cannot do. Again, this Court's decision in *Korte* summarized the demands of strict scrutiny under RFRA. 735 F.3d at 685-86.

The Committee has not explained how the Bankruptcy Code's avoidance and turnover provisions "deserve[] to be ranked as a governmental interest akin to the Social Security system in order of importance to the public good." *Id.*, at 686. But even if they are, the Committee has not "come close to carrying its burden of demonstrating that it cannot achieve [the Bankruptcy Code's] policy goals in ways less damaging to religious-exercise rights." *Id.*

The purpose of the Bankruptcy Code's avoidance and turnover provisions "is to maximize the bankruptcy estate and thereby maximize the recovery for creditors." *Roman Catholic Archbishop*, 335 B.R. at 864. But these provisions are limited—in principle and in practice:

> [T]he Bankruptcy Code itself contains various provisions that limit the breadth of the estate, including, for example, § 541(d), which excludes from the bankruptcy estate property in which a debtor holds only legal but not equitable title. There are also exceptions…to the policy of

35

> providing a debtor with a fresh start, such as the
> exceptions to discharge....Thus, the Bankruptcy Code
> itself provides for exceptions that do not further the
> policies of the Code.

*Id.* In light of these statutory exceptions, the bankruptcy court there found no

compelling governmental interest in applying section 544(a)(3). *Id.*

The Bankruptcy Code is replete with provisions that limit the breadth and

composition of the debtor's estate or otherwise create exceptions that do not

increase the size of the estate and the consequent distribution to creditors. The

purpose of the avoidance and turnover provisions, therefore, cannot rise to the level

of a compelling government interest. Moreover, for complementary reasons, there

are a host of provisions that could be enacted to increase the size of the estate

without substantially burdening religion.

The Supreme Court has never held that applying the Bankruptcy Code qualifies

as a compelling government interest, nor would it likely do so if presented with the

question. Compelling government interests are only those "interests of the highest

order." *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 546 (1993).[7]

In *Young II*, the court concluded that the interests advanced by the bankruptcy

system are by definition not compelling under RFRA. 82 F.3d at 1420.

The Committee cites four cases, without explanation, for the proposition that the

Bankruptcy Code provisions on which it relies do serve a compelling government

interest. Appellant Br. at 37. Two of the cases do not involve the Code provisions at

---

[7] Those include the tax system, *Hernandez*, 490 U.S. at 699; the social security system, *United States v. Lee*, 455 U.S. 252, 258-59 (1982); and national security and public safety, *Gillette v. United States*, 401 U.S. 437 (1971).

issue here. *See id.* (citing *In re Meyer*, 467 B.R. 451 (Bankr. E.D. Wis. 2012) (free exercise challenge to § 707(b)); *In re Navarro*, 83 B.R. 348 (Bankr. E.D. Pa. 1988) (establishment clause challenge to § 1325(b))). The bankruptcy court case that remains, *Newman*, 183 B.R. at 251, relied on *In re Young*, 152 B.R. 939 (D. Minn. 1993) (*Young I*), which was reversed on this very issue by the U.S. Court of Appeals. *Young II*, 82 F.3d at 1419-20 (interests advanced by the bankruptcy system not compelling under RFRA).

The Committee also bears the burden to show that its asserted compelling interest is achieved by the least restrictive means. Its appellate brief does not even address the issue. Had it tried, the Committee could not have shown that the relevant Bankruptcy Code provisions utilize the "least restrictive means" of furthering the interest the Committee articulates—that is, to enhance the size of the estate and the distribution to its legitimate creditors. 42 U.S.C. § 2000bb-1(b).

In *Callahan v. Woods*, 736 F.2d 1269, 1272-73 (9th Cir. 1984), the court said this test "forces us to measure the importance of a regulation by ascertaining the marginal benefit of applying it to all individuals, rather than to all individuals except those holding a conflicting religious conviction." *Id.* at 1272. If the compelling goal can be accomplished despite the exemption of a particular individual, then a regulation that denies an exemption is not restrictive.

The objective of enlarging debtors' bankruptcy estates will not be undermined by exempting those rare instances where the free exercise of religion is substantially burdened by avoiding a transfer or otherwise compelling turnover. The court in

*Young II* articulated the point well: "[W]e cannot see how the recognition of what is in effect a free exercise exception to the avoidance of fraudulent transfers can undermine the integrity of the bankruptcy system as a whole; its effect will necessarily be limited to th[is] debtor's creditors, who will as a result have fewer assets available to apply to the outstanding liabilities." 82 F.3d at 1420. In other words, even if there are fewer assets to distribute, the importance of respecting religious convictions outweighs the importance of applying the Bankruptcy Code provisions here.

Again, this Court's recent decision in *Korte* summarizes the controlling precedent on both the "compelling interest" and "least restrictive means" requirements of RFRA. Through the Affordable Care Act, Judge Sykes wrote for the majority, "the government grants so many exceptions already, it can hardly argue against exempting these plaintiffs." 735 F.3d at 686. By analogy here, "there are many ways to increase [the size of the estate]…without doing damage to the religious-liberty rights of conscientious objectors" to some of the law's provisions. *Id.*

Congress has myriad avenues for increasing the size of bankruptcy estates in general by, for example, restricting rather than expanding exemptions. For its part, the Committee has its own alternatives for increasing the distribution to creditors by, for example, ensuring the vigilant pursuit of preference claims and supporting or opposing elements of the plan of reorganization or, for that matter, proposing its own plan—all of this without substantially burdening the free exercise of religion.

Congress itself provided an example of "least restrictive means" through its enactment of the Religious Liberty and Charitable Donation Protection Act of 1998 ("RLCDPA"). With RLCDPA, Congress engrafted onto section 548 a specific exception for religious tithes and other charitable donations. *See* 11 U.S.C. §§ 544(b)(2), 548(a)(2), 548(d)(3). RLCDPA makes clear that—both through and despite statutory exceptions—it is possible to achieve the Bankruptcy Code's general interests using less restrictive means by protecting tithing. The "least restrictive means" standard in RFRA is not satisfied here.

## III. THE FREE EXERCISE CLAUSE ALSO BARS THE COMMITTEE'S TURNOVER AND AVOIDANCE CLAIMS.

The Committee claims that the First Amendment does not apply because it is not a "government actor." Appellant Br. at 29-30. It cites three cases to support its position, which turn on the "color of law" analysis under section 1983. *E.g., Harvey v. Harvey*, 949 F.2d 1127 (11th Cir. 1992) (analyzing whether private mental hospital acted under color of law). As an initial matter, the Committee is a not a private actor because, at a minimum, it is acting under color of law. *See* sec. I.A., *supra*.

In addition, the free exercise clause applies in suits between private parties. *See, e.g, McDaniel v. Paty*, 435 U.S. 618 (1978) (in action between competing candidates, Tennessee law barring ministers from serving as delegates to state constitutional convention violated free exercise clause); *Tomic v. Catholic Diocese of Peoria*, 442 F.3d 1036, 1039-42 (7th Cir. 2006) (First Amendment precludes former music minister's age discrimination suit against Catholic diocese). Section 1983 certainly

provides a mechanism for enforcing constitutional rights; however, it is by no means the only one. RFRA aside, the First Amendment's free exercise clause still applies to the Committee and its claims.

### A.  The Free Exercise Analysis Requires Examination Of The Burden.

The Supreme Court in *Employment Division v. Smith*, 494 U.S. 872 (1990), held as a general proposition that a law neutral and of general applicability need not be justified by a compelling governmental interest, even if it has the *incidental effect* of burdening a particular religious practice. *See Lukumi Babalu*, 508 U.S. at 531 (emphasis added). Indeed, "[N]o Free Exercise Clause violation results where a burden on religious exercise is the incidental effect of a neutral, generally applicable…regulation, in which case such regulation need not be justified by a compelling governmental interest." *CLUB*, 342 F.3d at 763 (citing *Smith*, 494 U.S. 872; *Lukumi Babalu,* 508 U.S. 520).

Courts have formulated the free exercise analysis in different ways but, in the Seventh Circuit, "[t]he relevant inquiry is two-fold." *Vision Church v. Vill. of Long Grove*, 468 F.3d 975, 996 (7th Cir. 2006). A court first examines whether the challenged law is "neutral and of general applicability." *Id.* "This does not end the inquiry, however: '[A] regulation neutral on its face may, in its application, nonetheless offend the constitutional requirement for governmental neutrality if it unduly burdens the free exercise of religion….'" *Id.* (citing *Jimmy Swaggart Ministries v. Board of Equalization*, 493 U.S. 378, 384-85 (1990)).

Contrary to the Committee's assertion, this Court's examination of the burden in *Vision Church* was at the heart of the Court's First Amendment analysis. 468 F.3d

at 996 ("Simply put, both the Free Exercise Clause and RLUIPA provide that, if a facially-neutral law…imposes a substantial burden on religion, it is subject to strict scrutiny."). In fact, the Court found that the subject property annexation statutes were neutral and generally applicable but then analyzed whether the effects of the village's actions were "anything more than incidental." *Id.* at 998. The court applied the same analysis to an assembly ordinance—while facially neutral, the court asked whether the burden was substantial or merely incidental. *Id.* at 999-1000.; *see also Family Life Church v. City of Elgin*, 561 F. Supp. 2d 978, 986 (N.D. Ill. 2008) (citing *Vision Church*, 468 F.3d at 996, for the proposition that even if a facially neutral law unduly burdens the free exercise, it must still be justified by a compelling governmental interest). Whether or not a burden on religious exercise is the "incidental effect" of the law cannot be ignored—it must be analyzed or the constitutional test is incomplete.

Here, strict scrutiny applies in the first instance because the relevant Bankruptcy Code provisions are not facially neutral and generally applicable. A law lacks facial neutrality if it "refers to a religious practice without a secular meaning discernible from the language or context" or if its object is to suppress religious practice. *Lukumi Babalu*, 508 U.S. at 533-34. A law lacks general applicability if it imposes burdens only on conduct motivated by religious belief in a selective manner. *Id.* at 543. Several Bankruptcy Code provisions lack facial neutrality: two sections explicitly carve out religious and charitable contributions from the reach of bankruptcy law. 11 U.S.C. § 548(a)(2), (d)(4); 11 U.S.C. § 544(b)(2). Provisions that

protect contributions to qualified religious entities (known in some faiths as "tithing") most certainly "refer[] to a religious practice without a secular meaning discernible from the language or context" and, therefore, cannot be deemed neutral. Strict scrutiny applies. *Lukumi Babalu*, 508 U.S. at 533-34.

### B.    Applied Here, The Bankruptcy Code Would Impose A Substantial Burden On The Trustee.

Even if this Court finds the Bankruptcy Code facially neutral (it is not), the inquiry does not end there: "[A] regulation neutral on its face may, in its application, nonetheless offend the constitutional requirement…if it unduly burdens the free exercise of religion." *Vision Church*, 468 F.3d at 996. For free exercise purposes, an undue, even substantial, burden exists "when the government [has] put substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Family Life Church*, 561 F. Supp. 2d at 987 (citing 468 F.3d at 997).

It cannot be said that the effect of the avoidance and turnover provisions here would be anything short of substantial. If the Committee were permitted to enforce the Bankruptcy Code's avoidance and turnover provisions against the Trustee, the Committee would force the Trustee to violate his religious beliefs and obligations under Canon law. The provisions, as the Committee attempts to apply them, are subject to strict scrutiny precisely because they are substantial. Moreover, the challenged provisions are not narrowly tailored to serve a compelling government interest under the First Amendment—for reasons that need not be repeated here. *See* Section II.B. *supra*; *see also Lukumi Babalu*, 508 U.S. at 546 (if the interest that a law seeks to achieve could be accomplished through drawing the law more

narrowly, while burdening religion to a lesser degree, or if the law is "overbroad" or "underinclusive," the law is not narrowly tailored.). The First Amendment, like RFRA, precludes the Committee from reaching the Trust's assets.

## IV. THE DISTRICT COURT APPROPRIATELY DENIED THE COMMITTEE'S MOTIONS TO VACATE THE JUDGMENT AND TO RECUSE JUDGE RANDA.

The Committee's motion to vacate and motion to recuse Judge Randa came swiftly on the heels of the decision against the Committee. The motions are a thinly-veiled attempt to find a new district court judge who will agree with the Committee on the merits of this litigation. The motions have served only to delay the appellate review of questions of law and increase litigation costs, decreasing creditor recovery.

The motions fail for a threshold reason—they are untimely. A party seeking Rule 60(b)(6) relief from a judgment must file the motion within a "reasonable time." *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 863 (1988). When a movant relies upon 28 U.S.C. § 455 disqualification for Rule 60(b) relief, as the Committee does here, section 455 determines whether the motion was timely. *See*, *e.g.*, *Travelers Ins. Co. v. Liljeberg Enters., Inc.*, 38 F.3d 1404, 1410 (5th Cir. 1994); *Summers v. Singletary*, 119 F.3d 917, 920-21 (11th Cir. 1997). Under section 455, "[t]he law is well settled that one must raise the disqualification of the judge at the earliest moment after knowledge of the facts demonstrating the basis for such disqualification." *United States v. Patrick*, 542 F.2d 381, 390 (7th Cir. 1976).

If the movant knew—or could have known—the basis for the recusal motion before an adverse decision, any post-decision motion is untimely. *Schurz Commc'ns, Inc. v. FCC*, 982 F.2d 1057, 1060 (7th Cir. 1992); *see also Union Carbide Corp. v. U.S. Cutting Serv., Inc.*, 782 F.2d 710, 716 (7th Cir. 1986) (recognizing the timeliness requirement). The need for timeliness serves an obvious purpose: "[l]itigants cannot take the heads-I-win-tails-you-lose position of waiting to see whether they win and if they lose moving to disqualify a judge who voted against them." *Schurz*, 982 F.2d at 1060.

If the basis for recusal is a matter of public record, as in this case, then the failure to seek recusal in a timely manner is inexcusable. *See Liljeberg*, 486 U.S. at 863 n.11 (ground for recusal "was not a matter of public record at the time the case was tried and decided"); *United States v. Ruzzano*, 247 F.3d 688 (7th Cir. 2001) (even if the party did not know of the basis, recusal is not timely when the basis is a matter of public record); *see also Union Carbide Corp.*, 782 F.2d at 716 (stock ownership was a matter of public record).

Here, neither motion is timely. The fact that some of Judge Randa's family members are buried in the Archdiocese's cemeteries always has been a matter of public record. Indeed, the Committee's counsel obtained the information regarding the judge's deceased relatives through a simple internet search, which included the cemetery web site. *See* Sapp 447-449. The Committee either knew, or should have known, of the basis for its recusal motion long before Judge Randa ended, or even entered, the case.

The Committee states that it is not seeking Judge Randa's recusal because he is Catholic. *See* Sapp 428. But, surely, the long-known fact that he is Catholic (like the Bankruptcy Court judge) must have put counsel on notice that it was at least possible—indeed, probable—that relatives were buried in a Catholic cemetery. Indeed, even a cursory internet search of public records disclosed that Milwaukee Catholic and Jewish cemeteries list the family names of 18 of the 28 judges and magistrates serving in the Eastern District and Seventh Circuit. For lack of timeliness alone, the motions should be denied.

### A.     Assuming Its Merits Are Reached, The Recusal Motion Is Baseless.

A disqualifying interest means one of two things: a "financial interest" in the subject matter of the case or in a party or "any other interest" that could be substantially affected by the outcome. 28 U.S.C. § 455(b)(4); *see generally Hook v. McDade*, 89 F.3d 350, 356 (7th Cir. 1996); *see also In re New Mexico Natural Gas Antitrust Litig.*, 620 F.2d 794, 796 (10th Cir. 1980).

The Committee contends that family burial rights, purchased more than 38 years ago, establish a direct financial interest in the cemetery trust litigation. Sapp 436-439. No. A prohibited "financial interest" means "ownership of a legal or equitable interest, however small…in the affairs of a party." 28 U.S.C. § 455(d)(4). In turn, an "interest" means "an investment or other asset whose value depends on the outcome, or some other concrete financial effect." *Yaodi Hu v. Am. Bar Ass'n*, 334 F. App'x 17, 19 (7th Cir. 2009) (citing *Guardian Pipeline, L.L.C. v. 950.80 Acres of Land*, 525 F.3d 554, 557 (7th Cir. 2008)). Judge Randa's parents' burial rights are

neither an investment nor an asset, and their value certainly does not depend on the outcome of this litigation.

The Committee also argues that "Judge Randa has [a disqualifying] interest in seeing that the Cemetery Trust prevails so there are adequate funds to cover the Debtor's perpetual care obligations…." Sapp 439-441. Again, this "interest" does not meet the statutory definition—the Committee cannot show that Judge Randa would be financially impacted at all by this litigation. The Purchase Agreement at issue specifically provides that "[a]ll services about the crypt…requiring labor shall be performed only by the SELLER." Sapp 485; *see also* ¶ 19 ("care and maintenance shall be performed only by the SELLER").

The Committee erroneously has asserted that Judge Randa has a financial interest by virtue of the Archdiocese's contingent bankruptcy proof of claim for the "Cemetery Care Claimants" and, therefore, that he is a member of an uncertified class with a claim. Sapp 438 (*citing Tramonte v. Chrysler Corp.*, 136 F.3d 1025 (5th Cir. 1998)). Judge Randa has no such claim—the proof of claim expressly denies individuals the right to recover financially:

> Filing of this Cemetery Care POC [proof of claim] by the Archdiocese *does not constitute a request for payment* on behalf of any individual entity, and is without prejudice to the rights, if any, of any individual filing a proof of claim for perpetual care, or to amend this Cemetery Care POC.
>
> Filing of this Cemetery Care POC by the Archdiocese *does not constitute an assertion by the Debtor as to whether or not individual Cemetery Care Claimants are "creditors"*…with respect to the obligations of the Debtor to provide perpetual care.

Sapp 168 (emphasis added).

There is no possibility that resolution of the cemetery trust litigation would entitle Judge Randa to recover financially. He has not filed a proof of claim and, even if he (rather than his parents' estate) desired an individual claim for perpetual care, the deadline to file a proof of claim passed long ago. He is not seeking monetary relief, nor is he entitled to financial recovery—the dispositive factor in *Tramonte*, 136 F.3d at 1029.

The Committee alternatively asserts that Judge Randa should recuse himself because he has some "other interest that could be substantially affected by the outcome of the proceeding." 28 U.S.C. § 455(b)(4). This is also incorrect. A status the judge shares with the general public does not constitute a section 455(b) interest; it is too remote. *See In re New Mexico Natural Gas Antitrust Litig.*, 620 F.2d at 796-97 (a judge's status as natural gas consumer was too insubstantial to require recusal from cases involving antitrust claims against oil companies—even when the outcome could lower the cost of gas resold to customers); *see also Union Carbide Corp.*, 782 F.2d at 714-15.

Notwithstanding the Committee's attempt to distinguish "the public" in *New Mexico Natural Gas*, status as a natural gas consumer is no different than a consumer purchase of burial sites by an individual who years later becomes a judge. It is impossible for Judge Randa to be financially impacted by the cemetery trust litigation. Even assuming his interest would be affected, however, he shares this "detriment" with the community at large: more than 500,000 individual remains are interred in 1,000 acres of Archdiocese-owned land. Sapp 166.

As a final matter, section 455(b)(4) does not apply unless the judge knew of the disqualifying financial interest. *Liljeberg*, 486 U.S. at 859; *see* Richard E. Flamm, *Judicial Disqualification* § 24.4, at 711 (2d ed. 2007 & Supp. 2012). Of course the judge knew of his relatives' resting place, but the Committee's argument is devoid of any suggestion that Judge Randa knew of the personal financial interest it alleges. Thus, even if the Committee could demonstrate a prohibited interest (it cannot), the Committee has not established prior disqualifying knowledge.

Recusal is also unwarranted because no reasonable person would question Judge Randa's impartiality in these proceedings. *See* 28 U.S.C. § 455(a). The statute directs disqualification when "a reasonable person perceives a significant risk that the judge will resolve the case on a basis other than the merits." *In re Mason*, 916 F.2d 384, 385 (7th Cir. 1990) (citing *Liljeberg*, 486 U.S. at 865). This is an objective inquiry, essential when the question is appearance to the well-informed and thoughtful observer, not just to a hypersensitive or unduly suspicious person. 916 F.2d. at 386.

A reasonable person is able to appreciate the significance of the facts in light of relevant legal standards and judicial practice and can discern any "appearance" of impropriety that is merely an illusion. *In re Sherwin-Williams Co.*, 607 F.3d 474, 478 (7th Cir. 2010). Finally, a reasonable person is unconcerned with trivial risks as "there is always some risk, a probability exceeding 0.0001%, that a judge will disregard the merits." *Mason*, 916 F.2d at 386. Trivial risks are endemic, and were they enough to require disqualification, "we would have a system of preemptory

strikes and judge-shopping, which itself would imperil the perceived ability of the judicial system to decide cases without regard to persons." *Id.*

As Judge Easterbrook put it, judges regularly sit in cases that could affect their well-being tangentially. *In re Nat'l Union Fire Ins. Co.*, 839 F.2d 1226, 1229-30 (7th Cir. 1988). "These indirect effects do not cause informed, reasonable observers to doubt a judge's disinterest." *Id.* In *New York City Housing Dev. Corp. v. Hart*, 796 F.2d 976 (7th Cir. 1986), this Court concluded that a judge's ownership of municipal bond funds did not disqualify him in a case involving bonds issued by a different municipality, even though the funds had been underwritten by a party to the case. 839 F.2d at 1229-30. The Court also held in *Union Carbide* that the prospect that a judge would resent her husband's need to sell stock (and pay a relatively small brokerage fee) so that she could sit in a case was insufficient to question her impartiality. *Id.*

Here, the Committee asserts that "Judge Randa would be deeply concerned about the state of his parents' and other close relatives' bodies and gravesites," leading a reasonable person to question his impartially. R.19 at 17. Could a reasonable person make this leap in logic? Two or three extremely remote intervening factors would have to occur for the gravesites to fall into disrepair: the removal of funds from the Trust; the Archdiocese's failure to provide perpetual care,

potentially triggering the statutory duty of municipalities to step in and, continuing

the speculation, those same municipalities' failure to provide the care.[8]

The risk that the judge resolved (or would resolve in the future) any aspect of the

cemetery litigation on anything but the merits based on his relatives' resting place

does not even approach the standard in section 455(a). The petition for writ of

mandamus should be denied.

### B.     There Is No Basis To Vacate The Decision.

Federal Rule of Civil Procedure 60(b)(6) provides that a court may relieve a

party from a final judgment for several enumerated reasons or for "any other reason

that justifies relief." Vacating a decision is an extraordinary remedy. *Cash v. Illinois*

*Div. of Mental Health*, 209 F.3d 695, 697 (7th Cir. 2000), reviewed under the

deferential "abuses of discretion" standard. *E.g.*, *Philos Techs. v. Philos & D, Inc.*,

645 F.3d 851, 854-55 (7th Cir. 2011).

In conjunction with 28 U.S.C. § 455, Rule 60 provides "a procedure whereby, in

appropriate cases, a party may be relieved of a final judgment." *Liljeberg*, 486 U.S.

at 863. To what end? A Rule 60 motion is not a substitute for an appeal from the

underlying judgment. *See Travelers Ins. Co.*, 38 F.3d at 1408; *McKnight v. United*

*States Steel Corp.*, 726 F.2d 333, 338 (7th Cir. 1984). Thus, even assuming a judge

should have recused himself or herself under section 455, vacating a judgment

under Rule 60(b) is not automatically justified. *Williamson v. Indiana Univ.*, 345

---

[8] Under Wis. Stat. § 157.115(b)1.-2. (2011-12), the municipality may take control of any cemetery and its management and care if the cemetery authority fails for a period of one year, and the local government must step in if there is a failure of care for five or more years.

F.3d 459, 464 (7th Cir. 2003); *Liljeberg*, 486 U.S. at 862 ("As in other areas of the law, there is surely room for harmless error….").

If a violation of section 455 is established, moreover, Rule 60(b) relief is appropriate only after considering three factors: (1) the risk of injustice to the parties; (2) the risk that the denial of relief will produce injustice in other cases; and (3) the risk of undermining the public's confidence in the judicial process. *Id.* at 864. This Court need not reach the issue of whether to vacate the Decision because Judge Randa had no reason to recuse himself. Regardless, any identified error was harmless and the drastic remedy of vacating the Decision inappropriate.

First, this Court itself will ensure there is no injustice to the Trustee or the Committee by resolving the questions of law. A judge's failure to recuse himself is harmless when the judgment in question is reviewed *de novo* on appeal. *Williamson*, 345 F.3d at 464-65. The District Court had both the authority and the jurisdiction to decide all of the issues before it, and the Trustee is entitled to rely on that finality—subject to appeal. Remanding the matter to another district court judge will only impose unnecessary delay and costs on the estate and, no doubt, another appeal to this Court.

Second, there is no risk that failing to grant relief will produce injustice in other cases. The Committee argues that the District Court "interpreted the law in an unprecedented fashion" in finding the Committee within RFRA's definition of government. Not so. This Court will decide whether the District Court was right or wrong.  Moreover, the Committee's assertion that the Decision somehow opens the

door to sue creditor committees is fiction. Committees are sued, if rarely, and when the Committee is acting within the scope of its duties—indeed, duties specifically authorized by the Bankruptcy Court—it has immunity.

The Committee continues its parade of horribles by suggesting the Decision provides "a road map" for a religious entity to insulate its assets from creditor claims. Untrue. The Committee overlooks the safeguards inherent in RFRA's and the First Amendment's framework. Religious practices based on *sincere* religious beliefs that are *substantially burdened* are protected only if the law is not *narrowly tailored* (or the least restrictive) in furthering a *compelling government interest*. And there are many examples where these standards have not been met. The District Court found that RFRA and the First Amendment protect the Trustee's sincere religious exercise under the unique circumstances of this case—no more, no less.

If the Decision were vacated, it will undermine the public's confidence in the judicial system. The Committee's motions reflect its desire for a new district court judge and, at that, on a religious basis. "[T]he act of vacating the district court's judgment would be counterproductive, inefficient, and would serve only to weaken public confidence by undermining the finality of judgments." *Williamson*, 345 F.3d at 465. The Decision should stand. The appellate process provides the mechanism for error correction—though none is necessary here.

Finally, assuming the Court finds recusal warranted under section 455(a) alone, the Decision cannot be vacated on that basis because the Committee moved to

vacate after the Decision was issued. As Judge Easterbrook has explained: "[j]udicial acts taken before the [§ 455(a)] motion may not later be set aside unless the litigant shows actual impropriety or actual prejudice; appearance of impropriety is not enough to poison the prior acts." *United States v. Murphy*, 768 F.2d 1518, 1541 (7th Cir. 1985).

The reason for this rule is clear: if it cannot be shown that actual bias improperly influenced the court, it would be unjust, and wasteful of judicial resources, to undo it. The Committee cannot show that Judge Randa's alleged bias influenced his Decision. Under the principles adopted in this circuit, the Decision should stand.

## CONCLUSION

For the reasons stated above, the Archdiocese of Milwaukee Catholic Cemetery Trust and its Trustee request that the Court affirm the District Court's Decision without recusal.

Dated:  February 24, 2014.

GODFREY & KAHN, S.C.

By:    *s/Brady C. Williamson*

Brady C. Williamson, SBN 1013896
Jennifer L. Vandermeuse, SBN 1070979

780 North Water Street
Milwaukee, WI 53202-3590
Phone: 414-273-3500
Fax: 414-273-5198
Email: jvandermeuse@gklaw.com

*Attorneys for Appellee Archbishop Jerome E. Listecki*

10758626.1

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)

I hereby certify that this brief conforms to the requirements set forth in Federal Rule of Appellate Procedure 32(a)(7) and Circuit Rule 32. This brief was produced using Microsoft Word 2010 word processing software in the proportionally spaced typeface, Century, in 12-point font. The length of this brief according to the word processing software used to prepare the brief is 13,933 words, excluding the corporate disclosure statement, table of contents, table of authorities, and certificates of counsel.

*s/Brady C. Williamson*
Brady C. Williamson

## CERTIFICATE OF SERVICE AND FILING

I hereby certify that on February 24, 2014, I electronically filed Corrected Response Brief of Appellee with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit using the CM/ECF system. I certify that I have confirmed that counsel of record are registered CM/ECF users. Service on counsel of record will be accomplished by the CM/ECF system, which will send notification of this filing to:

> Bruce G. Arnold
> barnold@whdlaw.com
>
> Daryl L. Diesing
> ddiesing@whdlaw.com
>
> Marci A. Hamilton
> hamilton.marci@gmail.com
> hamilton02@aol.com

> *s/Brady C. Williamson*
> Brady C. Williamson

# ADDENDUM OF
# CODE OF CANON LAW—EXCERPTS[1]

## JURIDIC PERSONS

Can. 113 §1. The Catholic Church and the Apostolic See have the character of a moral person by divine ordinance itself.

§2. In the Church, besides physical persons, there are also juridic persons, that is, subjects in canon law of obligations and rights which correspond to their nature.

. . . .

Can 116 §1. Public juridic persons are aggregates of persons…or of things…which are constituted by competent ecclesiastical authority so that, within the purposes set out for them, they fulfill in the name of the Church, according to the norm of the prescripts of the law, the proper function entrusted to them in view of the public good….

## SACRED PLACES AND TIMES

Can. 1205 Sacred places are those which are designated for divine worship or for the burial of the faithful by a dedication or a blessing which the liturgical books prescribe for this purpose.

## CEMETERIES

Can. 1240 §1. Where possible, the Church is to have its own cemeteries or at least areas in civil cemeteries that are designated for the deceased members of the faithful and properly blessed.

. . . .

Can. 1243 Particular law is to establish appropriate norms about the discipline to be observed in cemeteries, especially with regard to protecting and fostering their sacred character.

## THE TEMPORAL GOODS OF THE CHURCH

Can 1254 §1. To pursue its proper purposes, the Catholic Church by innate right is able to acquire, retain, administer, and alienate temporal goods independently from civil power.

---

[1] *Code of Canon Law: Latin-English Edition* (Canon Law Society of America, 1999).

Can. 1255 The universal Church and the Apostolic See, the particular churches, as well as any other juridic person, public or private, are subjects capable of acquiring, retaining, administering, and alienating temporal goods according to the norm of law.

Can. 1256 Under the supreme authority of the Roman Pontiff, ownership of goods belongs to that juridic person which has acquired them legitimately.

Can. 1257 §1. All temporal goods which belong to the universal Church, the Apostolic See, or other public juridic persons in the Church are ecclesiastical goods and are governed by the following canons and their own statutes.

. . . .

Can 1267 §3 Offerings given by the faithful for a certain purpose can be applied only for that same purpose.

. . . .

Can. 1273 By virtue of his primacy of governance, the Roman Pontiff is the supreme administrator and steward of all ecclesiastical goods.

CONTRACTS AND ESPECIALLY ALIENATION

Can. 1290 The general and particular provisions which the civil law in a territory has established for contracts and their disposition are to be observed with the same effects in canon law insofar as the matters are subject to the power of governance of the Church unless the provisions are contrary to divine law or canon law provides otherwise, and without prejudice to the prescript of can. 1547.

Can. 1291 The permission of the authority competent according to the norm of law is required for the valid alienation of goods which constitute by legitimate designation the stable patrimony of a public juridic person and whose value exceeds the sum defined by law.

Can. 1292 §1. Without prejudice to the prescript of can. 638, §3, when the value of the goods whose alienation is proposed falls within the minimum and maximum amounts to be defined by the conference of bishops for its own region [$7.5 million for the Archdiocese of Milwaukee], the competent authority is determined by the statutes of juridic persons if they are not subject to the diocesan bishop; otherwise, the competent authority is the diocesan bishop with the consent of the finance

council, the college of consultors, and those concerned. The diocesan bishop himself also needs their consent to alienate the goods of the diocese.[2]

§2. The permission of the Holy See is also required for the valid alienation of goods whose value exceeds the maximum amount, goods given to the Church by vow, or goods precious for artistic or historical reasons.

. . . .

Can. 1293 §1. The alienation of goods whose value exceeds the defined minimum amount also requires the following:

1° a just cause, such as urgent necessity, evident advantage, piety, charity, or some other grave pastoral reason;

2° a written appraisal by experts of the asset to be alienated.

§2. Other precautions prescribed by legitimate authority are also to be observed to avoid harm to the Church.

. . . .

Can. 1295 The requirements of cann. 1291-1294, to which the statutes of juridic persons must also conform, must be observed not only in alienation but also in any transaction which can worsen the patrimonial condition of a juridic person.

Can. 1296 Whenever ecclesiastical goods have been alienated without the required canonical formalities but the alienation is valid civilly, it is for the competent authority, after having considered everything thoroughly, to decide whether and what type of action, namely, personal or real, is to be instituted by whom and against whom in order to vindicate the rights of the Church.

. . . .

PIOUS WILLS IN GENERAL AND PIOUS FOUNDATIONS

Can. 1302 §1. A person who has accepted goods in trust for pious causes either through an act *inter vivos* or by a last will and testament must inform the ordinary of the trust and indicate to him all its movable and immovable goods with the obligations attached to them. If the donor has expressly and entirely prohibited this, however, the person is not to accept the trust.

---

[2] Canon 1292, §1—Minimum and Maximum Sums, Alienation of Church Property, Decree by the U.S. Conference of Catholic Bishops (December 1, 2011).

§2. The ordinary must demand that goods held in trust are safeguarded and also exercise vigilance for the execution of the pious will according to the norm of can. 1301.

Can. 1303 §1. In law, the term pious foundations includes:

. . . .

2. *non-autonomous pious foundations*, that is, temporal goods given in some way to a public juridic person with the obligation for a long time, to be determined by particular law, of celebrating Masses and performing other specified ecclesiastical functions or of otherwise pursuing the purposes mentioned in can. 114, §2, from the annual revenues.

. . . .

Can 1304 §1. For a juridic person to be able to accept a foundation validly, the written permission of the ordinary is required. He is not to grant this permission before he has legitimately determined that the juridic person can satisfy both the new obligation to be undertaken and those already undertaken; most especially he is to be on guard so that the revenues completely respond to the attached obligations, according to the practice of each place or region.

§2. Particular law is to define additional conditions for the establishment and acceptance of foundations.

Can. 1305 Money and movable goods assigned to an endowment are to be deposited immediately in a safe place approved by the ordinary so that the money or value of the movable goods is protected; as soon as possible, these are to be invested cautiously and usefully for the benefit of the foundation, with express and specific mention made of the obligation; this investment is to be made according to the prudent judgment of the ordinary, after he has heard those concerned and his own finance council.

. . . .

Can. 1310 §1. The ordinary, only for a just and necessary cause, can reduce, moderate, or commute the wills of the faithful for pious causes if the founder has expressly entrusted this power to him.

§2. If through no fault of the administrators the fulfillment of the imposed obligations has become impossible because of diminished revenues or some other cause, the ordinary can equitably lessen these obligations, after having heard those concerned and his own finance council and with the intention of the founder preserved as much as possible....

§3. In other cases, recourse is to be made to the Apostolic See.

. . . .

Can. 1377 A person who alienates ecclesiastical goods without the prescribed permission is to be punished with a just penalty.

10859737.1